**REYNOLDS–SOUTHWESTERN CORPORA-
TION, et al., Appellants,**

**v.**

**DRESSER INDUSTRIES, INC., Appellee.**

No. 184.

Court of Civil Appeals of Texas.

Houston (14th Dist.).

Feb. 12, 1969.

Rehearing Denied March 12, 1969.

Walter C. Clemons, Jack W. Hayden, Thomas H. Lee, Houston, for appellants.

Alvin M. Owsley, Jr., Baker, Botts, Shepherd & Coates, Houston, for appellee.

TUNKS, Chief Justice.

For a number of years Vining T. Reynolds, one of the appellants, has been professionally engaged in exploration for oil and gas by use of seismograph. Before May 30, 1964, he conceived and worked on a machine called "Vibration Recording Interpreter." The purpose of that machine was to assist in the mechanical interpretation of data recorded by seismograph in such exploration. On that date, May 30, 1954, he completed the construction of the working model of such machine. On June 14, 1954, he filed an application for patent on it.

In 1954, Keith Beeman and Richard Parker were the owners of controlling interest in Southwestern Industrial Electronics Company, a corporation. They were officers and directors. That corporation, herein sometimes called "S.I.E.," manufactured and sold equipment used in seismographic exploration for oil and gas.

Before August 28, 1954, Reynolds on the one hand, and Beeman and Parker on the other, began negotiations as to an arrangement for the manufacturing and marketing of the seismographic recording interpreter which had been invented by Reynolds. An agreement was reached and reduced to writing in several related documents. In substance, it was agreed that Beeman and Parker should raise $300,000 to finance the commercial exploitation of the recorder and related processes. In consideration therefor it was agreed that Reynolds should assign to them an undivided one-half interest in his right to the invention and the pending patent of the "Vibration Recording Interpreter" as well as such improvements thereof as might be thereafter made or affected. As a medium for carrying out this agreement, the parties organized a corporation called Reynolds-Southwestern Corporation. V. T. Reynolds became the owner of one-half of the shares in this corporation and Beeman and Parker jointly were the owners of the other one-half. All three were officers and directors. Reynolds, Beeman and Parker assigned to the corporation their interests in the invention. It was agreed that Reynolds-Southwestern Corporation, hereinafter sometimes called "R.S.W." should first pay to Reynolds $50,000 out of the gross receipts from the commercial exploitation of the invention and, thereafter, should pay one-third of such gross receipts to Reynolds and another one-third to Beeman and Parker jointly. Arrangements were made restricting the sale by either party of his shares in Reynolds-Southwestern without

the consent of the other parties. Soon thereafter, S.I.E. assumed the obligation of Beeman and Parker to furnish the financing for the project and acquired their interest in the invention, including their right to be paid the one-third of the proceeds from the marketing thereof by R.S. W. From that time on until the relationship was terminated, the venture was carried on through the two corporations.

With the completion of these arrangements, the manufacture and marketing by R.S.W. of the interpreter proceeded with some degree of success. The machines were placed with oil companies and geophysical research companies, generally on a monthly rental basis. S.I.E. furnished personnel and money for the development of the invention.

Between the date of the beginning of this promotional arrangement and its termination the appellee, Dresser Industries, Inc., a corporation, acquired all of the shares in S.I.E. The shareholders of S.I. E., including Beeman and Parker, received shares in Dresser Industries in exchange for their shares in S.I.E. S.I.E. continued its corporate existence as a wholly-owned subsidiary of Dresser. Beeman and Parker continued to be directors and officers of S.I.E. as well as of R.S.W.

In explanation of the controversy which is the basis of this lawsuit, it is necessary to describe briefly and generally the procedure by which the principals of seismology are used in the exploration for geological structures where oil and gas may be found. It is a procedure whereby a tremor created by detonation of a charge of dynamite at or near the surface of the earth sets up waves which travel to the sub-surface geological structures and are reflected back to the surface. The time required for a wave to travel downward to a given stratum and back, by reflection, to the surface varies with the depth of the stratum. The measurements of the differences in the time lapse of these reflections at different points in an area permits the mapping, by

contour map or cross-section, of the differences in the depth of the stratum. Such a map shows the location of sub-surface geological structures which may contain reservoirs of oil and gas.

In 1954, when the parties started producing Reynolds' invention, the procedure used in seismographic exploration involved the use of detectors sitting on the ground which picked up the impulse from the reflected waves and transmitted them through electronic equipment which recorded them on photographic paper. The visual record thus created required, in order to give it validity, corrections to account for certain variables—the differences in the elevations of the detectors on the ground, the differences in the character and thickness of unstable deposits near the surface, called "weathering" and the differences in the distance of the detectors from the point at which the wave was originated.

Before Reynolds' invention those corrections were made by technicians who computed them from data furnished. Reynolds' invention computed those corrections mechanically and automatically. It was his testimony that the machine would make as many of such corrections in four minutes as would require three technicians a half-day of work.

Soon after Reynolds developed his automatic interpreter a change occurred in the procedure for seismographic exploration for oil and gas. Magnetic tape was used as a means of recording the reflections instead of photographic paper. The Reynolds' machine was not usable in making the corrections and interpretations of such magnetic tape records. The testimony shows that when this change occurred, Reynolds began working to make modifications in his machine so as to adapt it for use in interpreting tapes. Beeman and Parker, when they learned that he was using some of the promotional funds advanced by S.I.E. to finance such modifications, objected to his doing so. During the

time that R.S.W. and S.I.E. were, under their 1954 promotional agreement, jointly engaged in the production and marketing of Reynolds' interpreter, S.I.E. was working on a machine that could be used in the interpreting of seismographic data recorded on magnetic tape. The purpose of this machine upon which S.I.E. was working was to make the same adjustment in such tape recorded data as Reynolds' interpreter made in photographically recorded data. Though it is the subject of some dispute between the parties there is evidence from which a jury could have believed that Beeman and Parker deliberately concealed from Reynolds the fact that S.I.E. was working on such a device, which would be competitive with that being produced and marketed by R.S.W.

In the early part of 1957, the parties began discussing the termination of the promotional agreement which they had made in 1954. These discussions led to an agreement effecting such a termination. That agreement was reduced to writing and executed on May 22, 1957. The principal parties to this agreement were the corporations R.S.W. and S.I.E. Reynolds, personally, executed the contract as a guarantor of the performance by R.S.W. Another corporation, V. T. Reynolds, Inc., of which Reynolds was the sole shareholder, guaranteed the performance by R.S.W. up to a maximum of $75,000. At the time of these negotiations and the making of this contract, Beeman and Parker were officers and directors of both R.S.W. and S.I.E.

The substance of the termination agreement was as follows: R.S.W. acknowledged its indebtedness to S.I.E. for the advancement toward the expense of exploiting his interpreter in the amount of $242,735.18, and executed its note in that amount to S.I.E., which note was payable in monthly installments of about $10,000 each. (In 1958, the monthly payments were, by letter agreement, reduced to about $3,300 each). Reynolds personally endorsed and guaranteed the payment of this note. As security for the payment of the note, S.I.E. was assigned the interest in the application for the patent on the interpreter and was given mortgages on various other properties owned by R.S.W. as well as property personally owned by Reynolds. V. T. Reynolds, Inc., guaranteed the payment of the note but limited its liability to $75,000. R.S.W. also acknowledged its indebtedness to S.I.E. in the amount of $120,163.90 under its 1954 agreement to pay Beeman and Parker one-third of the proceeds from the marketing of the interpreter. It agreed to pay this sum by payment to S.I.E. of 50% of the net profit from the future marketing of the interpreter. Reynolds bought from S.I.E., at par, those shares of stock in R.S.W. which originally had been acquired by Beeman and Parker and by them transferred to S.I.E. S.I.E. assigned to R.S.W. its interest as assignee from Beeman and Parker of the 1954 promotional contract under the terms of which Beeman and Parker received one-half interest in the Reynolds' invention and were to receive one-third of the income from the marketing of the Reynolds' interpreter.

In September, 1961, R.S.W. was in default on its note to S.I.E. The balance due on it was about $70,000.00. Dresser Industries, Inc., as successor to S.I.E. filed suit to recover such balance due on the note and to foreclose the various items of security. R.S.W., Vining T. Reynolds and V. T. Reynolds, Inc., were named defendants. The defendants answered by general denial and by an allegation that the execution of the note was procured by fraud. The fraud defense was an allegation that S.I.E., acting through Beeman and Parker, had secretly undertaken to acquire the ideas and processes imbodied in Reynolds' invention and to use them in developing a competing machine, and that their activities in developing the competing machine had been concealed from R.S.W. and its officers during the course of the negotiations leading up to the execution of the agreement. R.S.W. and Reynolds also filed a cross-action against Dresser Indus-

tries, Inc., seeking recovery of damages caused by the alleged fraud of S.I.E., Beeman and Parker. In answer to this cross-action Dresser pleaded that such alleged cause of action was barred by limitation.

Before the testimony began the defendants, R.S.W., Reynolds and V. T. Reynolds, Inc., admitted that the plaintiff, Dresser Industries, Inc., was entitled to recover as it had pleaded in its petition unless such recovery was defeated by the defendant's establishment of their affirmative defense of fraud and by their cross-action based upon alleged fraud. Thereupon the court, in accordance with Rule 266, Texas Rules of Civil Procedure, gave the defendants and cross-plaintiffs the privilege of opening and closing and they proceeded to present their evidence. When the defendants and cross-plaintiffs rested, Dresser Industries, Inc., as cross-defendant, made a motion that the jury be instructed to return a verdict in its favor on the cross-action. It based its motion primarily on the ground that the cross-action was barred by limitation. In response to that motion the trial court withdrew the entire case from the jury, not only as to the cross-action but also as to the main case and rendered judgment that the plaintiff, Dresser, recover on its cause of action as pleaded and that cross-plaintiffs take nothing by their cross-action. The defendants and cross-plaintiffs have perfected their appeal from that judgment.

■ The suit by Dresser in the main case is the suit on the May, 1957, contract, and the promissory note given by R.S.W. to S.I.E. as an incident to that contract. That was a contract made by two corporations. The corporations, being legally recognized ficticious entities must, of necessity, act through representatives. The authority of those representatives to act for the corporation, must come, specifically or impliedly, from the board of directors. Article 2.31, Texas Business Corporation Act, V.A.T.S. For this reason Beeman and Parker, being members of the boards of directors of both parties, as well as officers of both, necessarily participated in the authorization of the making of the contract as representatives of both adverse parties to it.

■ The enforcement of contracts between corporations having common membership of their boards of directors is not favored by the law. Beeman and Parker, as directors of R.S.W. owed to it a duty of loyalty and were bound to exercise the highest good faith in the transaction of any of its business which might result in personal benefits to them or in benefit to any other corporation in which they had a personal interest. International Bankers Life Ins. Co. v. Holloway, (Tex.Sup.Ct.), 368 S.W.2d 567. Where, as here, there is a contract between two corporations having common members of their boards of directors, if the fairness of the contract is challenged, the corporation seeking to enforce the contract has the burden of proving the fairness of the transaction. Felty v. National Oil Co. of Texas, Tex.Civ. App., 155 S.W.2d 656, no writ hist.

■ One item of consideration received by R.S.W. in this transaction was the assignment to it by S.I.E. of the one-half interest in the Reynolds' invention and right, under the 1954 promotional contract, to receive one-third of the gross proceeds from the marketing of the Reynolds' invention. There was evidence from which the jury could have believed that at the time of negotiating and executing the contract sued on, S.I.E. was engaged in the development of a competing device which would interpret seismographic data recorded on magnetic tape. This fact could well have had a bearing on the value of the consideration received by R.S.W. The jury could have believed, under the evidence, that Reynolds, as director of R.S.W. did not know of this fact and that good faith on the part of Beeman and Parker toward R.S.W. obliged them to disclose it. Under such circumstances it cannot be said that the record shows, as a matter of law, that Beeman and Parker acted in good faith toward R. S.W.

■ Aside from the fiduciary relationships, and corresponding duties, that grew out of the structures of the two corporate parties, R.S.W. and S.I.E., another such relationship resulted from the nature of the contract between the parties. By such contract they became co-adventurers in the promotion of the Reynolds' interpreter. In such capacity they owed fiduciary duties to the enterprise and to their fellow promoters. Hyde Corporation v. Huffines, 158 Tex. 566, 314 S.W.2d 763. In such capacity they were obliged to make good faith disclosure of facts relevant to their transactions with each other. We are of the opinion that the evidence raised questions of fact as to whether this duty was breached by the failure, if any, of Beeman and Parker to disclose the fact that S.I.E. was developing a competing interpreter.

■ Insofar as the defendants in the main action assert the affirmative defense of fraud, the statutes of limitation are not applicable. Mason v. Peterson, (Comm. App.), 250 S.W. 142, judgment adopted; Preston v. Williams, Tex.Civ.App., 427 S.W.2d 157, no writ hist.

We are of the opinion that the evidence raised questions of fact as to such a breach of fiduciary duties by the parties to the 1957 contract as to constitute fraud in inducing its execution. The trial court therefore erred in instructing the verdict for the plaintiff, Dresser Industries, on the main cause of action asserted by it.

■ Though the statutes of limitation are no bar to the defense of fraud pleaded by defendants, they are applicable to the cause of action alleged by the cross-plaintiffs in their cross-action. The essence of the cross-actions is in the allegation to the effect that S.I.E., (of whom Dresser is a successor) unfairly appropriated to itself trade secrets relating to the invention of the Reynolds' interpreter, which secrets it acquired as a result of its participation in the joint promotion venture. The cross-action also includes allegations as to the fraudulent inducement to execute the May, 1957 contract. We are of the opinion that Art. 5526, Vernon's Ann.Tex.Civ.St., the two-year statute of limitations, is applicable. Jenkins v. Kimbro, Tex.Civ.App., 380 S.W.2d 189, err. dismd. This two-year limitation period began to run when the cross-plaintiffs knew of the alleged wrongdoing or knew of facts sufficient to excite such inquiry as would have been made in the exercise of reasonable diligence. Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738, 150 A.L.R. 775; Jenkins v. Kimbro, supra. Insofar as the corporate party, R.S.W., was concerned, limitations as to its cause of action began to run when a disinterested officer or director had knowledge of facts sufficient to require him to exercise diligence in discovering the fraud. International Bankers Life Ins. Co. v. Holloway, supra.

■ It is the contention of the appellee that the evidence in this case shows, as a matter of law, that the cause of action asserted in the cross-action is barred by limitation. The evidence shows that Reynolds admitted that he heard in August, 1958, that S.I.E. was manufacturing an apparatus capable of correcting seismograph records and that he "lost faith" in them as of that date. We are of the opinion that such admission on his part shows conclusively that he, on that date, had such knowledge of the conduct of S.I.E. as would start the running of the statute of limitations on the cross-action. Since that suit was not filed until October, 1962, it was barred by limitations and the trial court properly instructed a verdict and rendered judgment in favor of the cross-defendant on the cross-action.

That portion of the trial court's judgment relating to plaintiff's original cause of action and rendering judgment for plaintiff thereon is reversed and remanded. The cross-action filed by R.S.W. and Reynolds is severed from the main action and the trial court's judgment for cross-defendant is affirmed.