(No. 52975.—

*In re* PERRY G. CALLAS, Attorney, Respondent.

*Opinion filed September 29, 1980.*

CLARK, J., took no part.

Disciplinary proceeding.

John C. O'Malley, of Chicago, for the Adminstrator of the Attorney Registration and Disciplinary Commission.

Friedman & Koven, of Chicago, and Shea & Hett, Ltd., of Berwyn (Robert E. Kolek, Thomas A. Hett, and Gerald W. Shea, of counsel), for respondent.

MR. JUSTICE WARD delivered the opinion of the court:

Perry Callas was admitted to the bar of Illinois in 1951 and engaged in the private practice of law from 1952 until

1962, when he became associated with the American National Bank of Chicago (the Bank) as a trust officer. He resigned from the Bank's service in 1978, at which time he was a senior vice-president and deputy head of the trust department. He is now engaged in private practice.

In January 1978 Callas pleaded guilty in the United States District Court for the Northern District of Illinois to a criminal information charging embezzlement and conversion of funds entrusted to the Bank. He was fined $1,000 and placed on probation for one year. A hearing panel of the Attorney Registration and Disciplinary Commission found that his conduct brought the legal profession into disrepute and recommended that he be suspended from the practice of law for a period of 18 months and until further order of this court. The Review Board of the Commission affirmed the recommendation.

In January 1969 the circuit court of Cook County appointed the Bank as trustee to hold and to disburse certain sales tax funds which had been paid under protest pursuant to a statute which was later held to be unconstitutional. The Bank designated the respondent to handle this account, which developed into a fund of some $34 million. Because of the magnitude and complexity of the funding procedure it was determined that an independent computer service was required. On the recommendation of the respondent, the Bank in April 1969, retained the Mid-America Computer Corporation (MAC). In 1970 the respondent was named as head of the corporate trust department of the Bank and a Mr. Guthrie was placed in immediate charge of the refunding program. Guthrie would act under the general supervisory authority of Callas.

The respondent became interested in MAC as an investment and in April 1971 purchased a one-third stock interest in the company for approximately $26,700. He never served as an officer, director or employee and did not receive any compensation, fees or other remuneration

from MAC.

Callas had agreed earlier to serve as a guarantor or surety on a $30,000 loan obtained from another bank by his brother. When the brother defaulted in 1974 the respondent borrowed $25,000 from MAC and used the proceeds of the loan, together with $5,000 of his personal funds, to satisfy his obligation on the brother's loan. The loan by MAC was made on June 27, 1974, and the respondent gave a demand note to MAC calling for interest at 14¼%. At the hearing before the Commission he testified that he intended to repay the loan from his share of the proceeds of an expected sale of MAC to Shick-Reedy, a company which had made an offer of $1 million for MAC. The sale was not completed in 1974, as contemplated, because of litigation instituted by a stockholder of Shick-Reedy. Eight days after making the loan to the respondent, MAC, by its president, Pros, on July 5, 1974, requested Callas to arrange a $25,000 advance from the Bank, which Pros said was made necessary by the expense of handling the large number of claims filed in April and May. The advance was to be repaid by debiting future billings of the Bank by MAC for its services. This procedure had been followed on three previous occasions when MAC received advances from the tax accounts in the Bank. The largest of the earlier advances had been for about $16,000, and it had been repaid in six months from subsequent billings. Guthrie was out of town the day the respondent received the request from Pros for the advance, and the respondent testified that after making certain that the Bank had more than $25,000 in uninvested cash in the tax accounts he authorized the advance of $25,000. The respondent told Guthrie what he had done the day after the advance and asked, "Do you have any problem with this?" Guthrie replied that he did not as long as the advance would be credited against future billings. The respondent ordered three trust-department checks to be

prepared on three tax-refund accounts being administered by the Bank, the service-occupation-tax account, the tobacco-tax account, and the cigarette-tax account. Guthrie normally signed checks drawn on these accounts, but the respondent told Guthrie he would sign the checks "so that there would never be a question of who authorized the advance."

The respondent testified that he heard that MAC had made loans to certain of its employees at interest rates ranging from 4% to 6% in contrast to his loan at 14¼% and that he complained to Pros. The loan to him had been made on June 27, 1974, and at Pros' request the respondent, on July 8, did send a check to MAC in the amount of $69.27, representing one week's interest. The respondent said that because of a dispute which developed concerning the interest rate no other payments of interest were made by him. When the principal indebtedness to MAC was repaid in January 1977, as will be described later in this opinion, the respondent said he received a receipt for repayment of the $25,000 but did not get back the promissory note. This was, he said, because of the unresolved question of how much interest he owed.

For a period of about three months from July 5, 1974, the date of the advance, to October 16, 1974, no fees were paid by the Bank to MAC for its services. Guthrie was holding up payments on the invoices MAC submitted pursuant to the arrangement to repay the advance of $25,000. Pros, however, then spoke to the respondent and asked if the Bank would pay the June to October 1974 invoices, as MAC was having a serious cash-flow problem. The respondent told Guthrie that MAC would like to extend the advance for a little while, and he asked Guthrie if the Bank could pay the invoices submitted from June to October. As a result the Bank did pay MAC in October 1974 for its outstanding invoices.

In a statement the respondent filed with the Commis-

sion prior to the hearing he stated that Guthrie thereafter, on three or four occasions, asked him to question Pros about repayment of the advance. He talked each time to Pros, who asked him to defer holding up payment because of MAC's cash position. Callas said he felt, and he so advised Guthrie, that at the time the tax accounts were to be closed there would be much work remaining to be performed by MAC, and that the advance could be credited against the closing billings by MAC if the advance had not been satisfied by that time. He said that Guthrie did not object when the respondent explained this to him and said that prepayment of the advance would not be in jeopardy. He said he told Guthrie that he was the account administrator and should do as he wished. The Bank did not hold up MAC's billings, and the $25,000 advance was carried by the Bank until it was repaid in 1977.

Callas testified that when he had discussions of the matter with Guthrie the $25,000 was carried on the books of the Bank as an advance to MAC. He testified he was unaware that MAC showed on its books that its loan of $25,000 to Callas had been repaid. He testified that on January 7, 1977, he satisfied his loan from MAC using $25,000 that had been loaned to him by Mr. Shick of Shick-Reedy. The books of MAC were changed at that time to reflect that the loan was satisfied as of January 7, 1977, and MAC's books were changed to reflect also that the payment to it of the $25,000 in July 1974 was an advance payment by the Bank against MAC's future billings and not a repayment to MAC of the loan MAC made to Callas. The advance by the Bank to MAC was also repaid at this time. The loan of MAC to the respondent and the advance by the Bank were repaid at the same time at the insistence of Shick.

A Federal grand jury investigation was begun in March 1978, and Callas resigned his position at the Bank on April 12. When the investigation began, the Bank placed

the respondent on a paid-leave-of-absence status, but he testified that he voluntarily resigned because it had become apparent the "somewhere down the line I would have to resign from the bank." The Bank was not aware, until the commencement of the investigation, of MAC's loan to Callas and that Callas had acquired an interest in MAC.

In December 1978 the United States Attorney at Chicago filed a criminal information charging that on or about July 5, 1974, Callas, with intent to defraud, had embezzled and misapplied, in an amount less than $100, moneys entrusted to the Bank from its tax accounts and did convert the money to his own use and benefit.

Callas and his attorney had conferred with the prosecutors, and his attorney told him that the prosecutors were prepared to file a one-count information charging a misdemeanor. His attorney advised him that in the event he was not prepared to plead guilty to the criminal information the likelihood was that an indictment would be returned with at least three felony counts, representing the three checks the respondent had drawn in making the $25,000 advance to MAC. The respondent entered into a plea agreement with the United States Attorney's office and on his plea of guilty in the United States District Court in January 1979 was sentenced to pay a fine of $1,000 and placed on probation for a period of one year. He testified before the Hearing Board that despite his having pleaded guilty he did not feel that he had knowingly misapplied the funds.

At the hearing before the panel Callas testified that MAC was sold to Shick-Reedy for $1.6 million, of which Callas will receive approximately $490,000. He had received $40,000 as of the time of the hearing.

To summarize, in part: the respondent selected MAC to perform services for the Bank and later acquired the interest in MAC. On June 27, 1974, he borrowed $25,000

from MAC and executed a promissory note which provided for the payment of interest at a rate of 14½%. One week's interest in the amount of $69.27 was paid to MAC by the respondent on July 8, 1974. No interest was paid thereafter by the respondent, and this was because, he testified, a dispute arose as to the rate of interest on his loan. On July 5, 1974, the respondent approved an advance of $25,000 to MAC at Pros' request because of, Callas said, MAC's difficult cash position. Days before, however, MAC had given the respondent a cash loan of $25,000. Respondent testified he was unaware until much later that MAC's books reflected, apparently after the advance from the Bank was gotten, that the respondent's loan had been repaid.

Callas said that he understood the charge against him when he pleaded guilty. He said that his counsel advised him that if he would plead guilty to the information charging the misdemeanor the prosecution would remain mute and not make any recommendation to the court. The respondent's attorney advised him that if that was not to be the disposition of the case it was likely that there would be an indictment with three or more felony counts. The criminal information charged the respondent with embezzling and converting to his own use, on or about July 5, 1974, the date of the advance of $25,000 by the Bank to MAC, money entrusted to the Bank, by causing moneys to be disbursed from the three trust tax accounts. The criminal information charged that the amount involved was less than the statutory amount of $100, but it is obvious that the charge in that amount appeared because of the plea agreement which was entered into between the respondent and the prosecution. Obviously the offense charged to have been committed on July 5, 1974, involved an advance of $25,000 and not an advance of less than $100. The respondent was guilty of an offense involving $25,000 or he was not guilty at all. There was no embez-

zlement of less than $100.

In the plea agreement executed by the respondent it was stated that he was going to enter a plea of guilty "because he is in fact guilty of the charges." The agreement said further that the respondent acknowledged that he had converted to his own use "a sum of money from certain trust accounts of the bank," which obviously referred to the $25,000 advance. The maximum penalty under the information was a maximum jail sentence of one year and a maximum fine of $1,000. The court imposed the maximum fine and sentenced the respondent to probation for one year. The plea agreement recited the respondent's understanding that the United States Attorney had the right to notify any Federal or State agency by whom the defendant is licensed of his conviction and that the prosecution would make no recommendation to the court of the penalty to be imposed.

When an attorney is convicted of an offense involving moral turpitude the conviction is conclusive evidence of guilt and grounds for the imposition of discipline. This court will not go behind the record of conviction. Conviction of a crime of that character " 'establishes that the respondent has been guilty of conduct that falls far below the standards required of members of the legal profession.' " (*In re Andros* (1976), 64 Ill. 2d 419, 423, and cases cited.) Discipline, however, is not imposed because of the fact of conviction but because of the conduct underlying it. *In re Crane* (1961), 23 Ill. 2d 398, 400.

The misconduct here was a serious violation of important professional responsibilities with which the respondent had been entrusted. He, a lawyer of mature and sophisticated experience, pleaded guilty to what must be considered the misapplication and conversion of $25,000 for his personal benefit. The Bank was deprived of the investment or other use of the money for 2½ years. The advance, as it was termed, was not repaid from billings

submitted by MAC through the action of the respondent. This nonpayment of the advance was consistent with the entry in MAC's records indicating that its loan of $25,000 to Callas had been repaid.

We consider that the respondent's conduct, taken in its totality, as the report and recommendation of the Review Board put it, constituted a serious professional transgression and brought the legal profession into disrepute.

We order that the respondent be suspended from the practice of law for a period of 9 months.

*Respondent suspended.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.