ANTON PROS *et al.,* Plaintiffs and Counterdefendants-Appellants and Cross-Appellees, v. MID-AMERICA COMPUTER CORPORATION, *et al.,* Defendants and Counterplaintiffs-Appellees and Cross-Appellants.

Second District No. 84—0675

Opinion filed April 3, 1986.

James F. Bishop, of Bishop & Callas, of Crystal Lake, and Gerald W. Shea, Ira A. Rogal, and Jeffrey I. Kleifield, all of Shea, Rogal & Associates, Ltd., and Robert N. Hutchison, both of Chicago, for appellants.

Bruce L. Bower, Kimball R. Anderson, and Scott J. Szala, all of Winston & Strawn, and Alan I. Becker, of Burditt, Bowles & Radzius, Ltd., both of Chicago, for appellees.

PRESIDING JUSTICE NASH delivered the opinion of the court:

Anton Pros and Perry Callas, plaintiffs-counterdefendants, appeal from judgments entered against them in the circuit court of Du Page County in favor of defendants-counterplaintiffs, Flick-Reedy Corporation (Flick-Reedy) and its subsidiaries Mid-America Computer Corporation, a Delaware corporation (Mid-America), and Miller Fluid Power Corporation (Miller Fluid). Counterplaintiffs were awarded $270,000 in compensatory damages and $850,000 as punitive damages against Pros and Callas which were alleged to have resulted from the loss of computer services occasioned by a walkout or mass resignation of key employees of Mid-America. The walkout was alleged to have been fostered by Pros and Callas in breach of their fiduciary duties as presi-

dent and vice-president, respectively, of Mid-America. In addition, both men were found liable for $85,000 under an indemnity agreement between the parties relating to a customer claim. Directed verdicts in favor of counterplaintiffs were also entered against Pros on certain outstanding promissory notes to Flick-Reedy totaling $180,917.24, and against Callas for one note for $152,479.45. Pros and Callas appealed separately from the judgments against them.

The corporations cross-appeal from judgments entered in favor of Pros for $457,061 and in favor of Callas for $520,000 premised upon promissory notes given to them by Flick-Reedy for the 1978 purchase of the assets of Mid-America Computer Corporation, an Illinois corporation, by Flick-Reedy and also appeal from judgments in favor of Pros and Callas on counts of their counterclaim in which damages were sought for breach of fiduciary duties and alleged duress relating to the 1978 sale.

We have consolidated the appeals and cross-appeals for purposes of this opinion.

In their appeals, Pros and Callas raise issues relating to their fiduciary duty and the instructions to the jury. Alternatively, if liability is found to exist, Pros and Callas contend punitive damages were unfounded and excessive. They also each raise numerous claims of trial error and contend that verdicts were improperly directed against them on certain counts of the countercomplaint and that the $85,000 indemnity award to counterplaintiffs should be reversed for lack of notice, waiver and evidentiary support.

The record discloses that in 1967 Anton Pros, a data processor; Perry Callas, an attorney then employed as a trust officer for a bank; and James O'Toole formed Mid-America Computer Corporation, an Illinois corporation, each investing approximately $25,000 in the enterprise. The purpose of the corporation was to process data for other companies, and in 1969 it acquired a nonexclusive right to use of a manufacturing control computer software system called MACE. In 1970, Mid-America (Ill.) entered into an agreement with Frank Flick, who was the founder, president and board chairman of Flick-Reedy Corporation, to install the MACE system and assume control of computer operations at Miller Fluid Power Corporation. Flick-Reedy was essentially a holding company located in Bensenville with several operating subsidiaries, the principal one being Miller Fluid, which was also located at Bensenville and manufactured hydraulic cylinders; it was Flick-Reedy's primary source of profit.

Mid-America leased a computer and moved into the Miller Fluid plant, employing some of Miller's former computer employees. By the

mid 1970's, Miller Fluid was substantially computerized and Mid-America was operating its production scheduling, inventory controls, payroll, material acquisition and billing. In 1978 Flick-Reedy purchased Mid-America from Pros, Callas and O'Toole for approximately $1.6 million and the assumption of liabilities of Mid-America; part of the consideration included a loan by Flick-Reedy to Callas for $125,000. Pros, Callas and James O'Toole, as one-third owners of Mid-America, each received installment notes of $425,490 and $54,000 in cash for their respective interests in the company, and it was then liquidated for tax purposes and Mid-America Computer Corporation, a Delaware corporation, was formed.

Pros became president and a board member of the new Mid-America and Callas vice-president of administration. The company commenced an expansion program to develop computer hardware and software for use by Flick-Reedy and other companies, including Simpson Electric, Tokheim, Imperial Oil and for Texas Instruments minicomputers. A new shop floor control data processing plan was set up for Miller Fluid. The parent company, Flick-Reedy, and Miller Fluid developed cash flow difficulties caused, in part, by the substantial costs of funding Mid-America operations.

In October 1980, dissident directors of Flick-Reedy sought to assume control of that company from Frank Flick and remove him from office. The group included Flick's son-in-law and others who had acquired Flick-Reedy stock from certain of Flick's children without his knowledge, and on October 9 the Flick-Reedy board of directors voted to remove Flick as president. On October 12, Pros and Callas held a meeting with Mid-America computer employees and requested they sign letters saying they would resign if Flick were not reinstated; several did so. On October 13 a meeting was held attended by employees of Miller Fluid, Flick-Reedy and Mid-America with Flick, Pros and Callas. Flick requested the employees support him by signing letters of resignation if he did not remain president; several did so and gave them to Pros. On that day, Pros received $15,666.64 and Callas $4,166.66, described as vacation pay, and other sums of money from Mid-America. On October 24, Pros and Callas each took checks from Mid-America for $10,000, designated for travel advancement purposes, and used the funds for employment of attorneys. Evidence was presented that Pros advised Mid-America employees of a meeting to be held October 25, and 30 of them attended in the company cafeteria, together with Pros and Callas. Pros advised the employees that Flick was losing his effort to regain control of Flick-Reedy and, in negotiating with the board of directors, the computer unit could control

the functions of the company and they could force the board to negotiate with Pros whatever terms were necessary. Pros told the employees that Mid-America produced the daily sales reports of Miller Fluid, which were required by Flick-Reedy's lenders for continued financing, and the computer unit could close Miller Fluid if it did not have the reports. There was testimony that Pros also stated at the meeting that if the negotiations with the board broke down and the employees saw Pros and Callas leave their offices, the employees should also walk out as they should stick together.

On October 26, Pros and Callas held another meeting with employees in the plant cafeteria when they announced they would resign if Flick was removed and they should stand behind him. Lawyers employed by Pros and Callas also spoke, advising the employees they should make up their own minds whether to tender resignations. On October 27, Pros discussed with certain employees the departure of all systems personnel from Mid-America. On October 28, Pros and Callas formed a partnership, designated as Pros and Associates, to engage in computer services with offices in Naperville. On that day also the board removed Flick as president of Flick-Reedy.

On October 30, Pros and Callas met with employees of Mid-America in the computer offices. They prepared letters of resignation which they delivered and then left the building; employees of the computer department followed them out and met with Pros and Callas in a nearby restaurant. By the end of that day most employees of that department had left and the computers were unattended.

Officers of Flick-Reedy met with Pros and Callas on the evening of October 30 seeking to find a way to resume computer operations. Pros and Callas made an offer to purchase Mid-America (Del.) in exchange for cancellation of the notes they had received when they sold the original company to Flick-Reedy in 1978; the note balances then totaled approximately $560,000. Pros and Callas wanted Flick-Reedy to also pay Mid-America $200,000 per month for computer services plus a subsidy of $150,000 each month for a year. There was testimony Pros and Callas stated that unless their offer was accepted that night, Miller Fluid would get no further computer services from Mid-America and they would shut it down. The offer was rejected by Flick-Reedy representatives.

After the walkout of most of the personnel of the computer department, Pros and Callas continued to meet with them and with officers of Flick-Reedy. The remaining Mid-America employees sought to get the computers into operation, but with limited success. Essential records relating to computer operations were missing, including logs,

job schedules, operator's notes, rerun procedures and program documentation and could not be located. On November 2, Pros and Callas met in the offices of Pros and Associates with 30 or 35 Mid-America employees, both persons who remained on the job and those who had walked out, and discussed the situation. Pros stated he wanted the experienced employees to remain away from the computers and that everyone would eventually be able to return to the company. An employee who inquired whether he should return to work was advised by Pros that if he did the employee would not work for Pros when he got back in there.

On November 7, Pros and Callas submitted another offer to purchase Mid-America to the officers of Flick-Reedy. It provided that Pros and Callas would assume ownership of the company which would provide computer services to Flick-Reedy for $135,000 per month and for Flick-Reedy to assume sole responsibility for certain Mid-America debts. The Flick-Reedy board also rejected this offer.

The remaining employees of the computer department, together with new persons who were brought in, worked to restore operations. Although not shut down, Miller Fluid's operations were adversely affected and it took three to four months for it to resume normal business. The ongoing projects worked upon by Mid-America were halted. In January 1981, Templeton, Kenly & Co. purchased a majority of the Flick-Reedy stock for $4,800,000, and it determined, in part by reason of the walkout, that Mid-America had no future as a computer software company; most of its contracts with outside customers were in default and it was losing $100,000 per month. Outside consultants were employed to minimize the losses and by February 1981, some recovery had taken place. Pros sought to persuade the new owners of Flick-Reedy to take back the employees who had walked out as vital to operation of Mid-America, stating the walkout had been a mistake damaging to the companies; the owners declined to do so.

When Flick-Reedy subsequently refused to honor the promissory notes given Pros and Callas in 1978 to purchase the assets of Mid-America, this action was commenced by them to recover on the notes and the counterclaim was filed.

### CALLAS' APPEAL

We consider first whether the trial court erred in its instruction to the jury as to the issues of the case under count IV of the counterclaim, requiring reversal and a new trial.

Counterplaintiffs' instruction No. 15, given to the jury over objection, stated, *inter alia*:

"Turning now to Count IV of the claims by Flick-Reedy Corporation and Mid-America Computer Corporation, the issues to be decided by you are as follows:

 a. Mid-America Computer Corporation and Flick-Reedy Corporation claim that Pros and Callas breached their fiduciary duties owed as officers of Mid-America Computer Corporation by misappropriating corporate funds for personal use, by engaging in mismanagement, or by encouraging or failing to discourage a walkout of Mid-America Computer Corporation employees on October 30, 1980 that could have shutdown operations at Mid-America Computer Corporation or Miller Fluid Power Corporation; and

 b. Mid-America Computer Corporation and Flick-Reedy Corporation further claim that these actions proximately caused injury to Mid-America Computer Corporation, Flick-Reedy Corporation, or Miller Fluid Power Corporation.

When I use the term 'fiduciary duty,' I refer to the duty owed by all officers and directors of a corporation to act with a high degree of good faith and loyalty in managing the corporation, to avoid obtaining personal benefit at the expense of the corporation, and to take reasonable steps as trustees to protect the corporation and its assets from injury. *It is a breach of a fiduciary duty for a corporate officer or director to encourage, or fail to discourage, a walkout of the corporation's employees.*

In order to prevail under this Count, Mid-America Computer Corporation and Flick-Reedy Corporation have the burden of proving that Pros and Callas breached their fiduciary duties and that this breach injured Mid-America Computer Corporation or Miller Fluid Power Corporation. If you find from your consideration of all the evidence that these propositions have been proved, then your verdict should be for Mid-America Computer Corporation or Flick-Reedy Corporation.

\* \* \*

If on the other hand, you find that Mid-America Computer Corporation and Flick-Reedy Corporation have failed to prove the foregoing propositions, then your verdict should be for Pros and Callas. Your verdict also should be for Pros and Callas if you find from your consideration of all of the evidence that Pros and Callas have proved the proposition that their actions conformed to those expected of a reasonably prudent officer or director responsible for the protection of the interests of Mid-America Computer Corporation and Flick-Reedy Corporation."

(Emphasis added.)

Callas argues that by the declaration in the instruction that it is a breach of a fiduciary duty for a corporate officer to encourage, or fail to discourage, a walkout of corporation employees, the court invaded the province of the jury on that question of fact. He notes there are no reported cases which have held, as a matter of law, that such conduct constitutes a breach of a fiduciary duty by a corporate officer and asserts that the error requires reversal for a new trial.

Counterplaintiffs argue the instruction correctly stated the law as it was a breach of Callas' fiduciary duty as an officer of the corporation to either encourage or fail to discourage the corporate employees from engaging in a walkout. Counterplaintiffs offer no statutory or relevant case authority in support of their position, and argue that it was for the trial court to determine, as a matter of law, what conduct would breach a fiduciary duty, citing *Lindquist v. Highland Park Hospital Foundation* (1976), 40 Ill. App. 3d 722, 725, 353 N.E.2d 156; *Paulman v. Kritzer* (1966), 74 Ill. App. 2d 284, 289-95, 219 N.E.2d 541, *aff'd* (1967), 38 Ill. 2d 101, 230 N.E.2d 262; *Libco Corp. v. Roland* (1981), 99 Ill. App. 3d 1140, 1144-45, 426 N.E.2d 309; *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 824-25, 413 N.E.2d 1299.

■ As Mid-America Computer Corporation, of which Callas was an officer, was a Delaware corporation, the duty he owed to it is governed by Delaware law. (*Libco Corp. v. Roland* (1981), 99 Ill. App. 3d 1140, 1144, 426 N.E.2d 309; *Paulman v. Kritzer* (1966), 74 Ill. App. 2d 284, 289, 219 N.E.2d 541, *aff'd* (1967), 38 Ill. 2d 101, 230 N.E.2d 262.) It is generally recognized that its officers and directors occupy a fiduciary relationship toward a corporation. (*Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 278, 166 N.E.2d 793.) In *Guth v. Loft, Inc.* (1939), 23 Del. Ch. 255, 270, 5 A.2d 503, 510, the court stated that a corporate officer is held to scrupulous observance of his duty to both affirmatively protect the interests of the corporation committed to his charge and to refrain from doing anything that would work injury to the corporation. Under Delaware law, its officers and directors owe the corporation a fiduciary obligation of honesty, loyalty, good faith and fairness. *Singer v. Magnavox Co.* (Del. 1977), 380 A.2d 969, 977; see *Smith-Shrader Co. v. Smith* (1985), 136 Ill. App. 3d 571, 578-79, 483 N.E.2d 283.

While the general duty of a corporate fiduciary is not disputed by the parties, neither offer relevant statutory or case law directed to the issue of whether it is a breach of such duty to either encourage, or fail to discourage, a walkout of employees of the company. In this

case the trial court in its instructions to the jury defined the general fiduciary duty owed to the corporation by Pros and Callas as requiring a "high degree of good faith and loyalty in managing the corporation, to avoid obtaining personal benefit at the expense of the corporation, and to take reasonable steps as trustees to protect the corporation and its assets from injury." It is the further direction to the jury finding, as a matter of law, that encouraging, or failing to discourage, a walkout by employees is a breach of such duty which gives rise to the present issue. Callas and Pros objected to counterplaintiff's instruction No. 15 on the grounds the statement therein that it was a breach of a fiduciary duty to fail to discourage an employee walkout was an erroneous legal conclusion.

■ A verdict premised upon an improper statement of law will be set aside if prejudicial to a party (*Sullivan v. Heyer* (1939), 300 Ill. App. 599, 604, 21 N.E.2d 776), and it is reversible error to give an instruction which imposes a duty greater than that required by law. (*Pappas v. Peoples Gas Light & Coke Co.* (1953), 350 Ill. App. 541, 544, 113 N.E.2d 585.) It is a long-standing rule in Illinois that jury instructions which, in effect, direct a verdict for a party are condemned and can be sufficient cause for reversal. Reviewing courts considering the question have chiefly addressed negligence cases where, as here, the instructions set forth facts and state that a finding of such facts by the jury would necessarily constitute a finding of breach of duty as well. *McCray v. Illinois Central R.R. Co.* (1957), 12 Ill. App. 2d 425, 437, 139 N.E.2d 817 (instruction erroneous which stated findings of fact as to a fall on an icy sidewalk would constitute negligence as a matter of law); *Poteraske v. Illinois Meat Co.* (1951), 342 Ill. App. 555, 97 N.E.2d 475 (instruction stating plaintiff established negligence if she proved she bought beef from retailer which contained glass which injured her was erroneous); *Olson v. Peter Pan Bakery* (1948), 334 Ill. App. 208, 210-11, 78 N.E.2d 843 (instruction describing circumstances where it is negligent *per se* to leave a car on a highway); *Olympia Fields Country Club v. Bankers Indemnity Insurance Co.* (1945), 325 Ill. App. 649, 676, 60 N.E.2d 896 (instruction stating that defendant failed to exercise good faith in settling lawsuit); *Moran v. Chicago Title & Trust Co.* (1940), 306 Ill. App. 581, 29 N.E.2d 299 (instruction stating guest of tenant was negligent if he failed to ascertain location of floor of elevator before stepping in); *Burke v. Zwick* (1939), 299 Ill. App. 558, 563, 20 N.E.2d 912 (instruction that violations of certain statutes constituted negligence *per se*); *Bernier v. Illinois Central R.R. Co.* (1919), 213 Ill. App. 530, 537 (instruction stating engineer was negligent *per se* if he did not look out

for persons crossing tracks and keep train under control).

The reviewing courts have also upheld rulings refusing instructions which would invade the province of the jury's fact-finding duty. *Fornoff v. Parke Davis & Co.* (1982), 105 Ill. App. 3d 681, 688, 434 N.E.2d 793, *appeal denied* (1982), 91 Ill. 2d 568 (instruction properly refused which presupposed manufacturer had violated duty to adequately warn of drug's dangers); *Jones v. Atteberry* (1979), 77 Ill. App. 3d 463, 470, 396 N.E.2d 104, *appeal denied* (1980), 79 Ill. 2d 626 (instruction assumed plaintiff's version of facts); *Murphy v. Friel* (1946), 328 Ill. App. 586, 66 N.E.2d 450 (abstract of opinion) (instruction which assumed driver making U-turn failed to exercise care to control his car); *O'Neal v. Caffarello* (1940), 303 Ill. App. 574, 594, 25 N.E.2d 534, *appeal denied* (1940), 306 Ill. App. xxxii (instruction stating that acts or omissions of plaintiff constituted contributory negligence); *Village of Fairbury v. Rogers* (1881), 98 Ill. 554, 557 (instruction stating only hidden defects in street are negligent); see also *Paredes v. Bud Bailey Corp.* (1981), 160 Ga. App. 572, 573, 287 S.E.2d 620, 621 (court may determine if breach of fiduciary duty occurred if no jury); *Poulsen v. Russell* (Ia. 1981), 300 N.W.2d 289, 294 (instruction placing burden of proof on defendant to show he did not violate fiduciary duty was not erroneous because he did not object).

■ Arguably, the direction in the disputed instruction that it is a breach of his fiduciary duty for a corporate officer to encourage a walkout of employees might be considered as such a violation; but, as earlier noted, no directly supporting statute or case is offered. (See 2 Fletcher, Corporations sec. 345 (1982); Restatement (Second) of Agency sec. 393, comment (e) (1958); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 824-25, 413 N.E.2d 1299; *Bancroft-Whitney Co. v. Glen* (1966), 64 Cal. 2d 327, 347, 411 P.2d 921, 936, 49 Cal. Rptr. 825, 840.) However, the mandatory direction the jury must find there has been a breach of fiduciary duty absent evidence that a corporate officer did not affirmatively discourage an employee walkout finds no semblance of support from any source. The instruction had the effect here of directing a verdict for counterplaintiffs and could have acted to remove from consideration by the jury whether Pros or Callas otherwise breached their duty to the corporation. In arguments to the jury, counterplaintiffs noted neither Pros nor Callas had testified they ever told an employee not to leave Mid-America and stated, "if that's all they did, that would be enough to recover in this case ***."

We conclude that by specifying these circumstances in its instructions as constituting a breach of fiduciary duty the trial court invaded

the fact-finding province of the jury, to the prejudice of Pros and Callas, requiring reversal for a new trial of the issues under count IV of the counterclaim. See *Westinghouse Electric Elevator Co. v. La Salle Monroe Building Corp.* (1946), 395 Ill. 429, 70 N.E.2d 604; *Belleville National Savings Bank v. General Motors Corp.* (1974), 20 Ill. App. 3d 707, 708, 313 N.E.2d 631; *Reynolds-Southwestern Corp. v. Dresser Industries, Inc.* (Tex. Civ. App. 1969), 438 S.W.2d 135, 140.

■ Callas also contends that the judgment for $85,000 in favor of counterplaintiff, Flick-Reedy, under count VI of the counterclaim must be reversed. In that count Flick-Reedy sought recovery from Pros and Callas under a purchase of assets agreement entered between the parties when Flick-Reedy purchased the assets of Mid-America from Pros, Callas and O'Toole in 1978. The agreement provided that the sellers would indemnify Flick-Reedy and hold it harmless from certain claims, which included then pending litigation against Mid-America by Crescent Electric Supply Company. Callas argues that counterplaintiffs failed to give him notice of the *Crescent* claim as required in the indemnity agreement, that they waived their right to indemnity and that the sum recovered includes improper elements of damages.

Section 10—2 of the purchase of assets agreement between the parties provided that notice be given to the sellers of any claim giving rise to seller's indemnification obligation in order to give them a reasonable opportunity to defend at their own expense. The parties dispute whether the notice was required to be written. Callas refers to general section 11.07 of the agreement which provides that any notices required will be sufficiently given if sent by certified mail to specified addresses; counterplaintiffs, however, suggest that provision does not prevent other notice and that actual notice was apparent here as the *Crescent* litigation was pending when Callas appeared in that case. In addition, counterplaintiffs argue Callas received written notice of the claim for indemnification by the filing of the counterclaim herein, which expressly notified him of the claim for expenses of that litigation, and that he was also notified by certified mail. Callas responds that the certified letter must be disregarded as notice because, in trial, it was introduced in evidence in rebuttal rather than in counterplaintiffs' case in chief. He offers no relevant supporting authority for this argument, and we are satisfied that the notice requirements of the agreement were met.

■ Callas also argues counterplaintiffs waived their right to indemnification and the verdict of the jury was thus against the manifest weight of the evidence. To establish waiver, he relies upon evidence of the payment of installments on his note by Flick-Reedy after

the *Crescent* suit had been filed and on claimed oral statements by Frank Flick to Pros that the *Crescent* claim would not be held against them.

Mid-America had the right under the terms of the agreement to defer payments on the note to Callas pending resolution of a claim, but was not required to do so. Nor may that fact be considered as a waiver of the separate right to indemnification provided for in the agreement (see *John Kubinski & Sons, Inc. v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 1020, 339 N.E.2d 529), as section 11.03 of the agreement provided that waiver of one remedy would not waive any other. The jury may also have disregarded testimony by Pros, not otherwise corroborated, that Frank Flick would not require indemnification of the *Crescent* claim, if the jury did not find that believable. In any event, section 11.04 of the agreement required that a waiver of rights under it be in writing and ratified by the board of directors; that did not occur.

■ Callas argues further that the damages awarded under count VI must be reversed as they included legal fees for which indemnification was sought arising from the *Crescent* litigation. He cites *Singleton v. County of Cook* (1977), 53 Ill. App. 3d 994, 369 N.E.2d 227, which holds that an agreement to indemnify for costs does not obligate the indemnitor to pay attorney fees which are not recoverable except when required by the specific terms of the indemnity agreement. 53 Ill. App. 3d 994, 996, 369 N.E.2d 227.

We consider this argument to have been waived as no objection was made in trial to the relevancy of the fees sought, nor was the claim of error noted in Callas' post-trial motion. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 189-90, 417 N.E.2d 1322; *County Board of School Trustees v. Batchelder* (1955), 7 Ill. 2d 178, 183, 130 N.E.2d 175; *Graves v. North Shore Gas Co.* (1981), 98 Ill. App. 3d 964, 973, 424 N.E.2d 1279.

■ Callas also contends that the trial court erred in directing a verdict for counterplaintiff under count VIII of the counterclaim in which judgment was entered against Callas for $152,479.45 on his promissory note. Without reference to the record or citation of supporting authority, Callas argues that a question of fact remains whether the parties intended this note to be set off against the note Callas held from Flick-Reedy on the sale of Mid-America, which the jury should resolve. The only evidence presented in trial, however, was the due and unpaid note executed by Callas, and it made no provision for satisfaction other than payment. There was no issue of fact to be resolved by the jury, and the trial court correctly directed the

verdict. See *Main Bank of Chicago v. Baker* (1981), 86 Ill. 2d 188, 199, 427 N.E.2d 94.

As the judgment must be reversed for a new trial on the grounds discussed we need not consider the claims of evidentiary and trial error urged by Callas as they are not likely to occur on retrial.

■■ In Callas' appeal, we conclude the judgment for compensatory and punitive damages under count IV must be reversed and that matter remanded for a new trial. In all other respects, the judgments from which Callas has appealed will be affirmed.

### PROS' APPEAL

In his appeal, counterdefendant Anton Pros seeks reversal of the judgments against him for alleged breach of his fiduciary duty under count IV of the counterclaim and the judgment entered against him under the indemnity agreement as alleged in count VI. He also asserts the trial court erred in directing a verdict for counterplaintiffs under count VII of the counterclaim in which recovery was on certain promissory notes executed by Pros and raises numerous issues of claimed trial error.

The arguments of the parties in Pros' appeal relating to each of the substantive issues are essentially the same as in Callas' appeal, and we reach the same conclusions in this case. The judgment against Pros under count IV of the counterclaim for breach of his fiduciary duty must be reversed because of the erroneous instruction to the jury and will be remanded for a new trial. The judgment against Pros under the indemnity agreement in count VI of the counterclaim will be affirmed as will the judgment under count VII in which counterplaintiff recovered on the promissory notes executed by Pros. We need not consider Pros' claims of trial error in view of the disposition of count IV as they are not likely to occur on retrial.

### THE CROSS-APPEAL

In their cross-appeal, the corporate counterplaintiffs seek reversal of the judgments entered upon the verdicts against them in favor of counterdefendants, Pros and Callas, as to counts II and III of the counterclaim and also reversal of the judgments in favor of Pros and Callas on their complaints in which they recovered on the promissory notes given them by Flick-Reedy in 1978 towards the purchase of the assets of Mid-America (Ill.). Counterplaintiffs contend each of these judgments must be reversed because Pros and Callas breached a fiduciary duty arising from a joint venture between the parties, duress of the Flick-Reedy board of directors when it purchased Mid-America

and for erroneous evidentiary rulings.

### JOINT VENTURE

In count II of their counterclaim, and also as affirmative defenses to Pros' and Callas' actions on the notes, counterplaintiffs raised the issue of whether counterdefendants received an inflated and unfair price on their sale of the Mid-America (Ill.) assets to Flick-Reedy in 1978 for $1.6 million and the assumption of Mid-America liabilities. Counterplaintiffs argue that Pros and Callas were joint venturers with Flick-Reedy in the development of the MACE system by Mid-America (Ill.) prior to the sale and thus had the burden of proving that the price at which they sold it to Flick-Reedy, as a joint-venture partner, was fair. Counterplaintiffs assert Pros and Callas failed to carry their burden of proof as to fairness of the price requiring reversal and a new trial. Pros and Callas respond that Mid-America was not engaged in a joint venture with Flick-Reedy and, in any event, that Pros and Callas could not be held personally liable as shareholders and officers for a corporate transaction.

We consider first whether, under the evidence, a joint venture existed between Flick-Reedy and Mid-America (Ill.) or Pros and Callas so as to give rise to fiduciary duties between the parties. We note that over the years of their relationship, which commenced in 1970, neither the written agreements between the parties nor any other documentation or claim by any of them described it as a joint venture. That question first arose in counterplaintiffs' action brought in response to the Pros' and Callas' suits for recovery on the Flick-Reedy notes approximately 10 years later.

A joint venture has been said to be "an association of two or more persons to carry out a single enterprise for profit." (*Ditis v. Ahlvin Construction Co.* (1951), 408 Ill. 416, 426, 97 N.E.2d 244.) In *Carroll v. Caldwell* (1957), 12 Ill. 2d 487, 147 N.E.2d 69, the court stated,

> "[A] joint adventure contemplates an enterprise jointly undertaken; that it is an association of such joint undertakers to carry out a single project for profit; that there must be a community of interest in the performance of a common purpose, a proprietary interest in the subject matter, a right to direct and govern the policy in connection therewith, and a duty, which may be altered by agreement, to share both in profits and losses." (12 Ill. 2d 487, 496-97, 147 N.E.2d 69, 74.)

The existence of a joint venture may be inferred from facts and circumstances showing such an enterprise was in fact entered into (*Poli-*

*koff v. Levy* (1965), 55 Ill. App. 2d 229, 235, 204 N.E.2d 807, *cert. denied* (1965), 382 U.S. 903, 15 L. Ed. 2d 156, 86 S. Ct. 237), and the intent of the parties is the most significant element (*Maimon v. Telman* (1968), 40 Ill. 2d 535, 240 N.E.2d 652; *Baker Farmers Co. v. ASF Corp.* (1975), 28 Ill. App. 3d 393, 395, 328 N.E.2d 369). Co-venturers are in a fiduciary relationship with one another (*Carroll v. Caldwell* (1957), 12 Ill. 2d 487, 495, 147 N.E.2d 69), and when a transaction which occurred between them is challenged by a co-venturer, the other co-venturer who would sustain the transaction has "the burden of overcoming the presumption against the validity of the transaction by showing its fairness." *Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 280-81, 166 N.E.2d 793; *Ditis v. Ahlvin Construction Co.* (1951), 408 Ill. 416, 428, 97 N.E.2d 244.

Pros, Callas and O'Toole formed Mid-America (Ill.) in 1967, and it processed data for accounts other than Flick-Reedy or its subsidiary, Miller Fluid Power Corporation. In 1969, Mid-America acquired a nonexclusive right to use a manufacturing control computer software system called MACE which it initially leased and then purchased for $30,000 in 1971. In 1970, Pros proposed to Flick-Reedy that Mid-America install the MACE system at Miller Fluid and operate its computer to furnish data processing to that operation. A letter on October 13, 1970, from Frank Flick, as president of Flick-Reedy Corporation, to Anton Pros, as president of Mid-America Computer Corporation (Ill.), set forth the terms of the arrangement between the corporations. It provided that Mid-America would install the MACE system and its computer to replace equipment Flick-Reedy was renting from IBM; that Flick-Reedy would pay all expenses of the changeover and its operation together with some $29,000 in outstanding obligations of Mid-America; it was understood that Mid-America was also servicing other companies, and that would continue; it was estimated that first year cost to Flick-Reedy would be $770,000 and provided that any income resulting from sales of the marketing program software, or that previously used by Flick-Reedy, would go to Flick-Reedy;, Mid-America was to keep records and give Flick-Reedy continuing three- and five-month budgets of estimated income and expenditures and Flick-Reedy was to pay all operating expenses. The letter also suggested future arrangements which might be entered between the corporations after Mid-America had demonstrated its capability to service Flick-Reedy from its own generated working capital. One arrangement could be that charges be established and made to Flick-Reedy as determined from statistics developed during the experimental period; another arrangement noted was that Mid-America

might become a division or wholly owned subsidiary of Flick-Reedy by purchase. The term "joint venture" was not used in the letter, nor was reference made to any sharing of expenses or profits.

On these terms, Mid-America commenced installation of MACE at Miller Fluid and assumed operation of the computer. It subsequently replaced the computer with one leased by Mid-America and later moved its operations into the Miller Fluid plant. It took three to four years to install MACE and Mid-America worked regularly on modifications to the system. Flick-Reedy continued to fund all development and installation work, and from 1970 to mid-1978, Flick-Reedy paid Mid-America $1,330,593 for software purchases and $8,852,684 for data processing charges. During this period, Mid-America controlled its own operations under the arrangement stated in the Frank Flick letter, and Flick-Reedy did not acquire title to any of the computer programs developed by Mid-America. Although Mid-America showed some profits for the years 1972-1975, none were shared with or paid to Flick-Reedy. In 1978, by action of the Flick-Reedy board of directors, it purchased the assets of Mid-America (Ill.) from Pros, Callas and O'Toole, giving a $1,600,000 note and assumed its current liabilities.

Counterplaintiffs essentially rely upon the Frank Flick letter of October 13, 1970, as establishing a joint venture to develop the MACE system to which Mid-America contributed technical skills and Flick-Reedy financial support. Pros and Callas describe the arrangement between the parties as a "facilities management" agreement which is commonly used in the computer industry.

There is no direct evidence, and little circumstantial evidence, from which the jury could find that Flick-Reedy and Pros or Callas were engaged in a joint venture prior to the sale of Mid-America (Ill.) to Flick-Reedy, and we conclude its determination was not contrary to the manifest weight of the evidence.

■■■ As noted in the cases earlier cited, a joint venture must include a community of interest between the parties; a proprietary interest in a subject matter; the right of joint control over the venture; and sharing of both profits and losses. (See *Richton v. Farina* (1973), 14 Ill. App. 3d 697, 706, 303 N.E.2d 218.) The arrangement demonstrated by the evidence here, however, did not do so. It is apparent Flick-Reedy was not satisfied with its data control system and entered into the loosely defined arrangement with Mid-America (Ill.) in an effort to improve upon it. Flick-Reedy was prepared to pay Mid-America for use of the MACE system and its development and did so on the terms under which the two corporations operated from 1970 to

1978. Flick-Reedy did exercise some control over Mid-America operations by underwriting its expenses of developing the software system, but it did so without claiming any right to share in profits or acquiring any title in the computer software as it was developed. While it might be stated broadly that by a joint endeavor these corporations sought to develop a data processing system suitable for the Flick-Reedy plant operation, and also for marketing to other users, the evidence is insufficient to permit the conclusion that the undertaking was a joint venture giving rise to fiduciary obligations between the parties. Flick-Reedy purchased use of the Mid-America product and paid substantial sums to develop and improve it; however, that is all these parties agreed it should do. We consider it noteworthy that nowhere in the comprehensive purchase of assets documents by which Mid-America (Ill.) was acquired by Flick-Reedy is there any suggestion of a prior joint venture between the parties. It would appear inevitable that had such been the prior arrangement between the parties that an accounting between them of their respective rights as joint venturers would have been undertaken.

Having concluded a joint venture did not exist, we need not consider the further arguments of counterplaintiffs relating to the fairness of the purchase price of Mid-America (Ill.) and the admission or rejection of evidence directed to that issue. Nor do we find it necessary to consider arguments by Pros and Callas that as shareholders or officers of Mid-America they were not personally liable for a transaction between the corporations.

## DURESS

Counterplaintiffs next contend that the verdicts for Pros and Callas under count III of the counterclaim and on their affirmative defenses to the Pros' and Callas' notes should be reversed because the Flick-Reedy board of directors was under duress when it purchased the assets of Mid-America (Ill.) for an allegedly unfair price.

Counterplaintiffs argue that prior to their 1978 purchase of the Mid-America (Ill.) assets Miller Fluid had become dependent on Mid-America for computer services and the Flick-Reedy board of directors thus approved the purchase at an unfair price because of its possible loss. As evidence of duress, counterplaintiffs refer to a statement made by Frank Flick, who was president of Flick-Reedy, to a Flick-Reedy director that there was a conflict between Pros, Callas and O'Toole which might cause Mid-America to go out of business. Also, counterplaintiffs find support for their duress argument in the March 17, 1978, meeting of the Flick-Reedy board of directors at which the

purchase of Mid-America was approved. There, the board considered acquisition of Mid-America and reviewed the proposed terms. Frank Flick noted that Flick-Reedy and Miller Fluid were dependent upon the computer program which was in place and operated by Mid-America. Flick also, however, advised the board that Flick-Reedy had been committed since 1976 to acquire Mid-America and that he believed the various computer programs owned by that corporation to be worth $5 to $7 million and that it would be very beneficial to acquire it for $1.6 million and assumption of Mid-America debts. The Flick-Reedy board of directors thereupon approved the purchase with one dissenting vote.

Other evidence discloses that Frank Flick had long desired to acquire Mid-America; that was one of the alternates suggested in Flick's 1970 letter when these companies commenced their business relationship. In 1972, Flick-Reedy sought to acquire Mid-America for $1.3 million; that purchase was approved by the Flick-Reedy board of directors in 1973, but litigation within the Flick-Reedy corporation prevented it being carried out.

As authority in support of their duress argument, counterplaintiffs offer *Schlossberg v. E. L. Trendel & Associates, Inc.* (1978), 63 Ill. App. 3d 939, 380 N.E.2d 950, which states that duress may be found where a party, in order to prevent injury to himself or his property, is compelled to make payment which the other party has no right to receive and without adequate opportunity to resist the demand. We do not consider, however, that the fact one corporation is currently dependent upon the services of another in some aspect of its affairs is sufficient alone to establish duress. It was not shown here that Flick-Reedy had no other course than to purchase Mid-America or that it could not have declined to do so. To the contrary, Flick-Reedy's president believed his company was getting a bargain. While it may have been costly and inconvenient to replace the Mid-America computer system should that company go out of business, Flick-Reedy had in 1970 changed systems and could have done so again. It also appears from the evidence that the purchase price agreed upon was within the range considered correct by the Flick-Reedy officers and directors and there was no suggestion it was excessive until this litigation commenced about three years later. In considering this issue, we are also mindful that Flick-Reedy acted to purchase Mid-America in 1978 and the circumstances which arose in 1980 when its computer employees walked out cannot relate back as evidence of duress.

We conclude that the verdict of the jury which rejected counterplaintiffs' claim of duress was not contrary to the manifest weight of

the evidence.

 Finally, counterplaintiffs contend the trial court erred in excluding evidence that counterdefendant, Perry Callas, had been suspended from the practice of law for a period of nine months in 1980. (See *In re Callas* (1980), 82 Ill. 2d 6, 411 N.E.2d 273.) They argue that fact was admissible to effect Callas' credibility as a witness and as an attorney participating in the trial of this case.

Callas was convicted of embezzlement in 1979 under a plea agreement in which the sum taken was stated to be less than $100; as noted by our supreme court, the offense actually involved the taking of $25,000. (*In re Callas* (1980), 82 Ill. 2d 6, 13, 411 N.E.2d 273.) That offense concerned funds loaned to Mid-America (Ill.) by a bank for which Callas was then employed as a trust officer and a transaction in which he dealt with Anton Pros.

In the trial of this case, the fact of Callas' conviction was admitted for purposes of impeachment after he testified as a witness, but the trial court excluded from evidence the further fact Callas had been suspended from the practice of law in the disciplinary matter.

The general rule in Illinois holds that the circumstances related to a conviction admitted for purposes of impeachment are immaterial and not competent. (*Freeman v. Chicago Transit Authority* (1965), 33 Ill. 2d 103, 108, 210 N.E.2d 191; *People v. Mason* (1963), 28 Ill. 2d 396, 400, 192 N.E.2d 835.) We find no basis upon which to deviate from the rule in this case.

Accordingly, the judgments entered against Anton Pros and Perry Callas for breach of their fiduciary duties under count IV of the counterclaim will be reversed and remanded for a new trial. In all other respects, the judgments from which Pros, Callas and counterplaintiffs have appealed will be affirmed.

Affirmed in part, reversed in part and remanded.

REINHARD and STROUSE, JJ., concur.