JERALD HILL *et al.*, Plaintiffs and Counterdefendants-Appellees, v. OWEN BROWN *et al.*, Defendants and Counterplaintiffs-Appellants.

Fourth District   No. 4—87—0534

Opinion filed February 25, 1988.

Steven N. Mottaz, of Thomas, Mottaz, Eastman & Sherwood, of Alton, for appellants.

E. Mont Robertson, of Quincy, for appellees.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiffs filed a complaint to dissolve their Saler cow partnership with defendants and requested a sale of the partnership assets. Defendants' two-part counterclaim alleged (1) breach of a contract which dissolved a prior undocumented partnership, and (2) breach of an existing partnership agreement centered around one Saler cow. The circuit court of Pike County ordered the dissolution of the partnership, the undivided sale of the cow known as 10R at public auction and the dismissal of defendants' counterclaim. Defendants appeal and we affirm.

For about 2½ years prior to January 1, 1985, plaintiffs Jerald and Joann Hill and defendants Owen and Lisa Brown engaged in the business of buying, selling, breeding, and selling embryos from Saler cattle without the benefit of a partnership agreement. The animals were often bred by an artificial insemination and transport technique performed by Owen Brown (Brown). To produce embryos for transplant the cow is "superflushed," or given a series of shots causing her to generate more than one embryo. The shots should begin about nine days after the cow comes into heat and continue twice a day for four days. The fertilized embryos are then transplanted into recipient cows.

In the latter part of 1984, the parties met with an accountant, William Shotts (Shotts), to discuss the division of their informal partnership. Jerald Hill (Hill) testified Brown placed a value on the animals and equipment based on his own calculations, but they did not reach an agreement as to the value of the partnership. Brown said the partners agreed to the following figures:

(1) Business income from transplants outside the partnership: $31,500 in gross income times 2 equals $62,000.

(2) Brown's flushing fee for partnership cattle held by Hill: 17 flushes at $1,200 equals $20,400.

(3) Equipment: $15,000.

(4) Cattle (excluding 10R): $100,000.

(5) 10R: $30,000.

Shotts' notes from the meeting were introduced for the limited purpose of showing the parties discussed some figures relating to the division of the partnership. The notes reflect the partnership property was divided into three categories and valued accordingly. The categories and values are as follows: cattle $130,000, equipment $15,000, and business $88,500. The notes indicate the partnership property was to be divided in half. Shotts testified the business category encompassed anticipated business. Shotts recorded the numbers the partners discussed but he did not personally participate in the calculations. All the parties contributed equally to the discussions.

On January 1, 1985, the parties entered into a contract to dissolve their unwritten arrangement and to separate all of the jointly held property except for one cow known as 10R. The embryo transplant business was distributed to Brown and the cattle, excluding 10R, were distributed to Hill.

The national champion Saler cow, 10R, became the subject of a written partnership agreement that commenced on January 1, 1985, and ended the same year on December 31. The purpose of the partnership agreement was to produce embryos from 10R and transplant them into recipient cows. The resulting pregnancies were to be divided between the parties. Unfortunately, there was dissension among the partners soon after the partnership agreement was drafted and the business purpose was never consummated. The partners could not agree on a method of breeding 10R or on a purchase agreement and, as a result, 10R was not flushed in 1985.

In November 1985 and again in January 1986 Brown demanded and was refused possession of 10R for flushing and her calf for showing. On May 10, 1986, Brown took possession of both cows and began the flushing procedure. Three dead embryos were the result. Subsequently, plaintiffs filed a complaint to dissolve the partnership and made a motion for preliminary injunction to obtain possession of 10R and her calf. The injunction was granted and the court ordered defendants to return the cows immediately to plaintiffs. The court stipulated the super flush of 10R was to continue but stated she was not to be flushed again until further court order.

In their answer to the complaint to dissolve the partnership, defendants alleged plaintiffs failed to comply with the terms of the partnership agreement and requested 10R be sold in accordance with the agreement, which provided for the separate sale of the partners' one-half interests. Defendants' counterclaim, count I as amended, alleged plaintiffs failed to comply with paragraphs 2(a) through (o) of the contract that terminated the unwritten partnership. Under those terms, defendants were to allegedly receive plaintiffs' transplant business in the year 1986 valued at $20,400. Count II alleged breach of the written partnership agreement for plaintiffs' failure to allow defendants to flush and transplant embryos from 10R.

The trial court ordered the partnership dissolved and further ordered the chief asset, 10R, her issue, HBS-1T, and the latter's issue, to be sold at a Saler livestock show. The partnership centered around 10R actually dissolved by its own terms on December 31, 1985. The court stipulated "[t]he mode of sale shall be the offering of two undivided half ownerships, to be sold simultaneously as one unit; however, the proceeds to be segregated into two accounts, one for the ownership of Jerald and Joann Hill and one for Owen and Lisa Brown." The court also provided for flushing of the animal during the interim. The court dismissed defendants' amended count I of the counterclaim stating: "There was no evidence of a breach of the agreement entered into by and between the parties on the first day of January, 1985. Further the court finds no agreement binding the Hills to employ Owen Brown in embryo transplants for 1986 or any other time." Count II of the counterclaim was dismissed as the court found any damages were speculative, and Brown failed to mitigate them.

The first issue before this court is whether the windup procedures ordered by the trial court were proper. Defendants argue the trial court disregarded the clear intent of the partnership agreement when it ordered the two half-ownership interests in the sole partnership asset to be sold as a unit when the agreement expressly provided the asset be sold at public auction "in halves." Specifically, the agreement provided for termination of the partnership as follows:

"In the event parties are unable to agree upon the management and control of Number 10R Saler Cow, then both parties hereby agree that either party may, by giving notice to the other party, demand and receive the sale of Number 10R Saler Cow. The parties will have the right to negotiate with each other and agree upon a mutually accepted price. Once both parties have agreed upon a price for Number 10R Saler Cow, both parties will have a right to purchase the said cow. If both par-

ties desire to purchase Number 10R Saler Cow, then each party will give a written sealed bid for the purchase of Number 10R Saler Cow to William E. Shotts. The highest bidder shall purchase Number 10R Saler Cow. *However, if the parties cannot agree upon a price or the sale of Number 10R Saler Cow then Number 10R Saler Cow will be sold at public auction (in halves)."* (Emphasis added.)

The partnership agreement also stipulated the Hills were to have possession of 10R during calendar year 1985 and were required to make the cow available to Brown at all times for necessary transplant procedures.

■■ In a partnership agreement the rights and obligations of the parties depend on "their own precise agreement in all particulars, including dissolution, or termination." (*Meyer v. Sharp* (1950), 341 Ill. App. 431, 444, 94 N.E.2d 510, 516; *Estate of McKay v. Moses* (1976), 35 Ill. App. 3d 458, 343 N.E.2d 45.) Unless the agreement creating the joint venture provides otherwise, the standard procedure to wind up a dissolved partnership is conversion of its assets into cash by sale. Ill. Rev. Stat. 1985, ch. 106½, par. 38; *Polikoff v. Levy* (1971), 132 Ill. App. 2d 492, 270 N.E.2d 540.

■■ A partnership agreement like any other contract must be construed so as to determine the intent of the parties. (*Saballus v. Timke* (1983), 122 Ill. App. 3d 109, 460 N.E.2d 755.) The parties here made an agreement, but their intention is not clear. Shotts testified Brown insisted on inserting the term "in halves" in the termination provision of the partnership agreement and Shotts understood the term pertained to the partners' particular percentage of ownership in the cow. Although Hill could not recall the reason for the inclusion of the term, Brown gave the following explanation:

"All they could do is sit back and not agree on anything and force a sale. By me giving up all the cattle, they were a lot more financially better off than I was, and they could force the sale just by disagreeing; and I had all intents when I bought the cow to keep that cow for her lifetime because she's very valuable to me; and if that was not inserted, '(in halves)', then I couldn't protect my interest; in other words, they wanted to sell their half [*sic*], they could; and it would be sold in halves so that if I didn't want my half to sell I could buy my half back at the auction because I was paying myself."

Strict construction of the partnership agreement would require us to order the auctioneer to open bidding for the two halves of 10R separately. Brown would have the opportunity to bid on his half sold, but

sell he must. The "in halves" method is potentially more beneficial to the partner who can only afford to buy one half of 10R, but the risk remains here that Brown will be outbid on his half by Hill or another bidder. If we adhere to the trial court's ruling, 10R will be sold as one unit. Neither party will be prejudiced by the ruling because each will have an equal opportunity to bid on and purchase 10R at the public sale and neither will be excluded from their share of the sale proceeds. (*Mandell v. Centrum Frontier Corp.* (1980), 86 Ill. App. 3d 437, 407 N.E.2d 821.) Further, this method insures a wind up of the business of the partnership.

We find the "in halves" method confusing and cumbersome and believe the trial court's decision was correct. Complete liquidation of the partnership property as a unit with division of the proceeds is the most efficient and equitable method to resolve this matter.

Next, defendants maintain the trial court erred in dismissing amended count I of the counterclaim for failure to find the contract required plaintiffs to hire defendants to perform embryo transplants in 1986 or at any other time. The written contract which provided for dissolution of the oral partnership agreement divided the partnership assets in the following manner:

"[1.] It is understood and agreed that the HILLS shall take the following personal property to become their sole and absolute property exclusive of any claim by the BROWNS:

[a.] Saler Cows Number 988 and 40N;

[b.] All calves born prior to the date of the execution of this contract;

[c.] All recipient cows and embryos which are implanted and growing in any recipient cows prior to the date of this contract. (Embryos transplanted from 40N-1P-19L).

[2.] It is understood and agreed that the BROWNS shall take the following personal property to become their sole and absolute property exclusive of any claims by the HILLS.

* * *

[i.] Any and all claims to proceeds generated by embryo transplant business which was formally known as H & B Saler and this would include any and all goodwill or business contracts;

[j.] All interests in existing contracts which are held by H & B Saler;

[k.] All ownership or rights to any open and unused recipient cows which H & B Saler may possess."

Defendants contend item No. 2(i) included the agreement they

would continue to do all the transplant work during 1986 on the cows distributed to plaintiffs. However, after division of the partnership assets, plaintiffs did not engage defendants to perform the transplant procedures. Instead, plaintiffs leased their cattle to a farm in Montana which handled the transplants. The work allegedly denied defendants was valued by them at $20,400, based on Brown's interpretation of the figures Shotts recorded. The contract does not include figures.

■■ Where extrinsic evidence is introduced to aid in interpreting a contract, the meaning of the language in the contract is a question for the trier of fact, whose determination will not be reversed unless it is contrary to the manifest weight of the evidence. (*Chicago Principals Association v. Board of Education* (1980), 84 Ill. App. 3d 1095, 406 N.E.2d 82; *Howard A. Koop & Associates v. KPK Corp.* (1983), 119 Ill. App. 3d 391, 457 N.E.2d 66.) A trial court's judgment is against the manifest weight of the evidence if an opposite conclusion is clearly evident. *Dutton v. Roo-Mac, Inc.* (1981), 100 Ill. App. 3d 116, 426 N.E.2d 604.

■■ The most convincing evidence supporting the trial court's finding is the contract itself. The contract does not state defendants were entitled to conduct plaintiffs' embryo transplant business at any time. The contract does not place a monetary value on the transplant business either within or without the partnership. The value defendants placed on the transplant business is speculative at best since Shotts' notes were not introduced to prove the truth or validity of the figures he recorded. The contract to dissolve the oral partnership agreement clearly distributed the cattle to plaintiffs and the transplant business to defendants. We cannot conclude the contract either explicitly or implicitly gave defendants the right to physically perform, at any time, the transplant work on the cattle distributed to plaintiffs. We find the trial court's ruling in accord with the evidence.

Finally, defendants appeal the trial court's dismissal of count II of their counterclaim alleging plaintiffs had breached the partnership agreement by failing to give possession of 10R to defendants on January 1, 1986, and refusing to allow defendants to conduct the necessary transplant procedures.

Under the Uniform Partnership Act, a partner has an equal right with his copartners to use or possess any partnership property. (Ill. Rev. Stat. 1985, ch. 106½, par. 25(2)(a); *Lindley v. Murphy* (1944), 387 Ill. 506, 56 N.E.2d 832.) Defendants contend it was improper for the trial court to issue an injunction which restricted defendants' access to 10R and restored sole possession of 10R to plaintiffs in May

1986 when the partnership agreement expressly limited their custody period to calendar year 1985. *Cook v. Lauten* (1948), 335 Ill. App. 92, 80 N.E.2d 280.

■ Defendants are estopped from debating the propriety of the injunction because they failed to do so at an earlier point in the proceedings. Issues raised for the first time on appeal normally may not be considered by the appellate court or argued on appeal. (*Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 443 N.E.2d 575.) Beyond this procedural restriction is the partnership agreement itself, which is silent as to possession of 10R after calendar year 1985. Alternate possession of 10R is not mentioned. Furthermore, continued possession of 10R by plaintiffs was proper under section 23 of the Uniform Partnership Act. (Ill. Rev. Stat. 1985, ch. 106½, par. 23.) The statute provides:

"(1) When a partnership for a fixed term *** is continued after the termination of such term *** without any express agreement, the rights and duties of the partners remain the same as they were at such termination, so far as is consistent with a partnership at will.

(2) A continuation of the business by the partners ***, without any settlement or liquidation of the partnership affairs, is prima facie evidence of a continuation of the partnership." Ill. Rev. Stat. 1985, ch. 106½, par. 23.

■ The trial court dismissed count II of the counterclaim and held defendants failed to show they were prevented from flushing 10R due to improper action by plaintiffs. Defendants insist they made several efforts to gain access to 10R in 1985 in order to flush her but each time plaintiffs resisted. Defendants also claim they were paralyzed by the May 1986 injunctive order eliminating contact with 10R. The doctrine of avoidable consequences supports the trial court's finding that plaintiffs' exclusive possession of 10R was not a debilitating condition. Defendants should not be allowed to recover damages for consequences they could reasonably have avoided. (*Maere v. Churchill* (1983), 116 Ill. App. 3d 939, 452 N.E.2d 694.) Specifically, defendants could have petitioned the trial court for their own injunctive relief which, if granted, would have allowed them to proceed with the flushing procedures. The trial court demonstrated it was receptive to such a request by defendants in the May 1986 order when it allowed defendants to complete the flush they had initiated when they took possession of 10R earlier that month. Although the injunction prevented regular flushing until further court order, there was nothing to prevent defendants from requesting the trial court to assist them in

minimizing or preventing their damages.

■ The trial court further held that even if defendants were arguably entitled to the profits they allegedly lost while they were refused access to 10R, the measure of their damages would be too speculative. We agree.

Lost profits are allowed as measure of damages when a business is interrupted only if the business has been established prior to the interruption. They are inappropriate where proof of those profits is based on speculation or conjecture. *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.* (1986), 143 Ill. App. 3d 168, 491 N.E.2d 912.

Brown testified 10R was purchased on the basis of her bloodlines and the flushing record of her mother since the trait for producing good embryos is inherited from the mother. The mother's records indicate she had been flushed nine times in a row, approximately every 60 days and produced 12.5 transferable embryos per flush. Hence, Brown estimated 10R could have been super flushed four times in 1985, six in 1986 and two in 1987, for a total of 12 embryos. Under the partnership agreement, one-half of the pregnancies would have belonged to each partner. In addition to their one-half of the pregnancies, defendants were allegedly entitled to a fee of $1,200 per super flush, or an estimated $14,400. The expert witness called by defendants similarly estimated 10R will produce 10 to 12 good embryos per flush, with a conception rate of 70%. The expert said a cow with 10R's potential could produce offspring each worth around $7,000. He testified it is possible, but not likely, 10R is less prolific than her mother.

The speculative nature of this business and lack of evidence of 10R's breeding capabilities via flushing techniques require this court to affirm the trial court's conclusion. Based on her heritage, defendants and their expert could only predict 10R will have a successful flush record in the future, her embryos will produce living offspring in the future and the offspring will be marketable in the future. At the time of hearing, 10R had not ever produced a viable embryo. We would affirm the denial of a lost profits award to a new business of even a more conventional nature if it presented us with a similarly insubstantial business record.

For the foregoing reasons, the judgment of the circuit court of Pike County is affirmed.

Affirmed.

McCULLOUGH and SPITZ, JJ., concur.