**HALLMARK INSURANCE ADMINIS-TRATORS, INC., and Daniel J. Kubik, Plaintiffs,**

v.

**COLONIAL PENN LIFE INSURANCE COMPANY, a Pennsylvania corporation, Defendant.**

**No. 87 C 1770.**

United States District Court, N.D. Illinois, E.D.

Sept. 23, 1988.

Herbert Beigel, Leigh R. Lasky, Herbert Beigel & Associates, Chicago, Ill., for plaintiffs.

David L. Doyle, Linda M. Wakeen, Phelan Pope & John, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs Hallmark Insurance Administrators, Inc. ("Hallmark") and Daniel J. Kubik bring this three-count diversity action against Colonial Penn Life Insurance Company ("Colonial") charging the breach of three contracts and accompanying fiduciary duties. Colonial moves for summary judgment under Fed.R.Civ.P. 56 on all counts and seeks sanctions under Fed.R. Civ.P. 11. For the reasons set forth below, the motion for summary judgment is granted in part and denied in part, and the motion for sanctions is denied.[1]

### I.

#### Undisputed Facts

Hallmark was incorporated in 1986 to fulfill various obligations arising out of three contracts executed on September 24, 1986, by Kubik, Hallmark's incorporator and sole shareholder, and Colonial, a Pennsylvania insurance company. The contracts included an Administrator Agreement, in which Hallmark agreed to service specified policies underwritten by Colonial in return for various forms of compensation; a Guaranty Agreement, in which Colonial guaranteed a $1.5 million bank loan to

---

1. Colonial earlier moved to dismiss Counts II and III on grounds identical to those set forth in the motion for summary judgment. Since we now grant Colonial's motion for summary judgment as to these counts, the motion to dismiss is moot. Fed.R.Civ.P. 12(b).

Hallmark for start-up and operational expenses in consideration of a security interest in Hallmark's assets, representation on Hallmark's board of directors and limited control over Hallmark's employment decisions; and a Stock Option Agreement, under which Colonial retained the option of purchasing all Hallmark stock after 1991 at a price determined by formula. Hallmark's servicing duties under the Administrator Agreement included collecting premiums, adjusting and settling all claims valued at $25,000 or less and performing various reporting and recordkeeping tasks. At all times relevant to this action, the Administrator Agreement provided for Hallmark to service a single policy—a major medical policy sold by the Markman Group, Inc., an independent insurance sales agency, pursuant to a Marketing Manager Agreement between Markman and Colonial ("Markman Contract")—but expressly obligated the parties to "mutually explore opportunities to increase the scope" of the Agreement.

Colonial guaranteed a $1.5 million bank loan from the Harris Bank on behalf of Hallmark, and Hallmark prepared to service the medical insurance policy. In January 1987, however, Colonial decided not to offer the policy and accordingly "nonrenewed" the Markman Contract, presumably as authorized by the appropriate provisions of the Markman Contract. Colonial then notified Hallmark that it also intended to nonrenew the Administrator Agreement pursuant to the nonrenewal terms of the Markman Contract which Colonial contended and plaintiffs have consistently denied the Administrator Agreement incorporated. Colonial nonetheless continued to guarantee the Harris Bank loan, but on at least one occasion, approved Harris Bank's withholding of loan funds for a brief period. Colonial has never exercised its stock option, and Kubic remains Hallmark's sole shareholder.

On February 24, 1987, Hallmark and Kubik filed this action charging Colonial with breaching all three contracts (Count I) and breaching its fiduciary duties arising from a joint venture relationship established by the Agreements (Count II). In Count III, plaintiffs seek punitive damages for Colonial's willful and malicious breach of contract. Colonial contends on summary judgment that the undisputed facts demonstrate that Colonial did not breach any of the contracts, the contracts did not establish a joint venture and plaintiffs cannot recover punitive damages, lost profits or attorneys' fees.

## II.

### Standard of Review

■ Summary judgment is appropriate when the moving party demonstrates that all of the facts that could affect the outcome of the lawsuit are undisputed and that it is entitled on those facts to judgment as a matter of law. Fed.R.Civ.P. 56(c). *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir.1988). The moving party bears the burden of establishing the absence of any disputed material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If, however, the nonmoving party bears the burden of proving an issue at trial, it also bears the burden of presenting sufficient facts on summary judgment from which a trier of fact could find in its favor, and the moving party need only "[point] out to the District Court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 106 S.Ct. at 2554; *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir.1988). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Richardson v. Penfold*, 839 F.2d 392, 394 (7th Cir.1988).

## III.

### Breach of Contract

#### A. Administrator Agreement

■ Plaintiffs charge that Colonial breached the Administrator Agreement when it decided not to underwrite the medical policy listed in Schedule A and, generally, that it would no longer be bound to the Agreement. Colonial contends on summa-

ry judgment that its effective nonrenewal of the Markman Contract terminated its duties and Hallmark's rights under the Administrator Agreement. This contention hinges on two legal conclusions—that the Agreement is subject to the nonrenewal provision of the Markman Contract and that the parties did not contemplate that the Agreement created rights and duties independent of the Markman Contract. We find that the plaintiffs have identified factual disputes material to each of these legal conclusions and accordingly deny summary judgment as to liability under the Administrator Agreement.

The parties agreed that the policies of which Hallmark had the right and duty to service under the Administrator Agreement would be listed in Schedule A. At all times relevant to this action, Schedule A listed a single policy:

> Major Medical health insurance Certificates and Policies underwritten by Company and placed on behalf of Company pursuant to the Marketing Manager Agreement between Company and the Markman Group, Inc. of Dallas, Texas.

The Markman Contract, to which neither Hallmark nor Kubik were a party, provided that Colonial or Markman could nonrenew the contract without restriction as long as the party exercising this right provided notice within six months of any contract anniversary date. Colonial and Hallmark did not draft a nonrenewal provision into the Administrator Agreement but instead included a termination provision by which neither party could, except in limited circumstances not relevant here, terminate the Agreement until 1991. Colonial contends and plaintiffs dispute that by the Schedule A reference to the Markman Contract and Kubik's knowledge that the Markman Contract contained a nonrenewal provision, Hallmark agreed to incorporate

the nonrenewal provision into the Administrator Agreement.

Under Pennsylvania law,[2] two contracts negotiated and executed at the same time and concerning identical subject matter are interpreted as one, with each contract contributing to the determination of the parties' intent. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107–108 (3d Cir.1986). This rule may apply even if different parties negotiated and executed the separate contracts. *Von Lange v. Morrison-Knudsen Co., Inc.*, 460 F.Supp. 643, 648 (M.D. Pa.1978), *aff'd*, 609 F.2d 504 (3d Cir.1979). In *Kroblin*, the court found that the consideration supporting one contract supported another contract when the parties entered into the contracts simultaneously and the latter was a prerequisite to enforceability of the former. 805 F.2d at 108. Similarly, in *Von Lange*, the court found that a contract's termination provision applied to another contract lacking such a provision when both contracts provided for a term of three years, were executed at the same time and concerned the same subject matter and, most significant, "only by interpreting the two together [could] the true intent of the parties be understood." 460 F.Supp. at 648.

Plaintiffs have identified key disputed and undisputed facts in the record from which a trier of fact could conclude that Hallmark did not intend that the Administrator Agreement incorporate the Markman Contract nonrenewal provision. First and foremost, Colonial points to no evidence in the record demonstrating that Hallmark actually agreed that the Administrator Agreement was subject to any provision of the Markman Contract.[3] Further, unlike in *Kroblin* and *Von Lange*, the parties' true intent on this issue is ascertainable from the Administrator Agreement without reference to the Markman Contract. The parties expressly agreed when

---

2. In the absence of any Illinois public policy mandating the contrary, we give full force and effect to the provision in the Administrator Agreement stating that Pennsylvania law governs interpretation of the contract. *Hofeld v. Nationwide Life Insurance Co.*, 59 Ill.2d 522, 322 N.E.2d 454, 458 (1975).

3. Colonial relies heavily on evidence in the record that Kubik was aware that the Markman Contract contained the nonrenewal provision. Plaintiffs point out the ambiguity of this evidence and, in any event, such evidence does not establish any agreement to incorporate that provision.

and how either may terminate its duties under the Agreement, and the trier of fact could reasonably infer that the parties intended to preclude any other method of termination. In addition, the record contains evidence, notably testimony by Kubik, suggesting that Colonial committed to underwriting the medical policy until 1991, regardless of who—Markman, Colonial or any other sales agent—sold the policy.[4] Finally, certain provisions in the Administrator Agreement indicate that the parties intended that Hallmark would eventually service other policies not necessarily subject to a similar nonrenewal provision in a third-party marketing contract. Thus, a trier of fact could reasonably conclude that the parties referenced the Markman Contract in Schedule A not to supplement the parties' rights and duties but merely to identify with specificity the medical policy listed.

Even if it were undisputed that the fate of Hallmark's right to service the medical policy coincided with that of the Markman Contract, Colonial is not entitled to summary judgment because plaintiffs contend, with support in the record, that the parties contemplated a contractual relationship broader than the single policy listed in Schedule A. Section 1.1 provided that "[Colonial] and [Hallmark] shall mutually explore opportunities to increase the scope of this Agreement. Any additions to the business serviced pursuant to this Agreement shall be reflected in a change to Schedule A." Schedule A provided that the parties "understand that new insurance business developed by Markman and underwritten by [Colonial] shall be administered by [Hallmark] pursuant to an amendment to this Schedule." A Colonial vice-president suggested in deposition testimony that Hallmark would eventually service policies other than the Markman medical policy. Finally, Hallmark was contractually bound to continue servicing any medical policies sold by Markman and underwritten by Colonial, even if Colonial later terminated its relationship with Markman.[5] In conjunction with the five-year term of the Administrator Agreement, a trier of fact could find that Colonial's duties went beyond the Markman medical policy to include, among others, the duty to negotiate the addition of other policies to Schedule A.

In sum, the plaintiffs have pointed to evidence in the record that creates disputed issues as to whether Colonial was bound to underwrite the medical policy listed in Schedule A even if Markman lost the right to sell that policy and whether Colonial's duties under the Administrator Agreement went beyond that specific policy. Accordingly, we deny Colonial's motion for summary judgment as to liability under the Administrator Agreement.

### B. Guaranty Agreement

■ The parties do not dispute that Colonial guaranteed and continues to guarantee the $1.5 million Harris Bank loan to Hallmark. Colonial contends on these facts that it satisfied all of its duties under the Guaranty Agreement. Plaintiffs present evidence that Colonial instructed the Harris Bank on January 22, 1987, to refrain from advancing further loan funds to Hallmark. The trier of fact could find from the provisions of the Guaranty Agreement and the parties' broader contractual relationship that Colonial breached the Agreement when it interfered with Hallmark's receipt of loan funds to continue operations. We accordingly deny summary judgment as to Colonial's liability under the Guaranty Agreement.

### C. Stock Option Agreement

■ Plaintiffs have, however, failed to present any evidence that would support a

---

**4.** Kubik's admission that an underwriter customarily reserves the right to cease issuing a policy does not prove conclusively that Colonial expressly reserved that right in the context of this case. With Kubik's testimony, it remains disputed whether Colonial promised Hallmark that the policy would be available at least until 1991.

**5.** It is of no consequence to our decision that Markman never sold, Colonial never underwrote and Hallmark never administered a major medical policy. The import here of Hallmark's continuing duties is not whether they were actually assumed but whether they evidence the parties' intent that the Administrator Agreement survive the Markman Contract.

finding that Colonial breached the Stock Option Agreement. It is undisputed that Colonial has not exercised the stock option. Plaintiffs contend in opposition to summary judgment that Colonial requested this Court in the contexts of the motions for temporary restraining order and preliminary injunction to allow them to exercise the stock option and thereby breached the Agreement. Colonial's requests were always contingent on a finding, under the standards appropriate to the particular motions, that either they effectively terminated (or, more accurately, nonrenewed) the Administrator Agreement, and the Stock Option Agreement expressly provides that colonial may exercise the option under such circumstances, or that plaintiffs breached the Agreement by not entering into a stock escrow agreement. These acts cannot constitute a breach of the Agreement, lest we adopt the novel and unsupported proposition of law that a party breaches a contract when it seeks to enforce its rights under that contract. Accordingly, Colonial is entitled to summary judgment as to its liability under the Stock Option Agreement.

## IV.

### Breach of Fiduciary Duty

Plaintiffs' breach of fiduciary duty claim hinges on their allegation that the parties entered into a joint venture. Fiduciary duties of loyalty and good faith attach to all dealings among joint venturers. *Ambuul v. Swanson*, 162 Ill.App.3d 1065, 114 Ill.Dec. 272, 276, 516 N.E.2d 427, 431 (1st Dist.1987); *Joseph v. Algemene Bank Nederland, N.V.*, 592 F.Supp. 141, 148–49 (W.D.Pa.1984).[6] Colonial contends on summary judgment that the undisputed terms of the contract establish as a matter of law that the parties did not enter into a joint venture. We agree and accordingly grant summary judgment as to Count II.

■ "A joint venture is an association of two or more persons to carry out a single enterprise for profit." *Overseas Develop-*

*ment Disc Corp. v. Sangamo Construction Co.*, 840 F.2d 1319, 1331 (7th Cir.1988), quoting *Smith v. Metropolitan Sanitary Dist.*, 77 Ill.2d 313, 33 Ill.Dec. 135, 138, 396 N.E.2d 524, 527 (1979). The following are essential to a joint venture: a common interest in the purpose of the venture, as shown by each venturers' contributions of property, financial resources, effort, skill or knowledge; mutual control over the policies of the enterprise; the right to direct and govern the conduct of the other in connection with the venture and the sharing of the venture's profits and losses. *Barton v. Evanston Hospital*, 159 Ill.App. 3d 970, 111 Ill.Dec. 819, 821, 513 N.E.2d 65, 67 (1st Dist.1987); *Clapp v. JMK/Skewer, Inc.*, 137 Ill.App.3d 469, 92 Ill.Dec. 187, 189, 484 N.E.2d 918, 920 (3d Dist.1985). In the absence of any of these elements, there is no joint venture. *United Nuclear Corp. v. Energy Conversion Devices, Inc.*, 110 Ill.App.3d 88, 65 Ill.Dec. 649, 663, 441 N.E. 2d 1163, 1177 (1st Dist.1982); *Pros v. Mid-America Computer Corp.*, 142 Ill.App.3d 453, 96 Ill.Dec. 572, 491 N.E.2d 851 (2d Dist.1986).

■ The status of joint venturer is not imposed by law but assumed voluntarily. Thus, determining the existence of a joint venture is a matter of gleaning the intent of the parties involved and is ordinarily best left to the trier of fact. *O'Connell v. Pharmaco*, 164 Ill.App.3d 68, 115 Ill.Dec. 277, 280, 517 N.E.2d 688, 691 (4th Dist. 1987); *Ambuul*, 114 Ill.Dec. at 276, 516 N.E.2d at 431. However, when the contract establishing the parties' relationship is clear and unambiguous, intent is determined solely from the contract, *Public Electric Construction Co. v. Hi–Way Electric Co.*, 62 Ill.App.3d 528, 19 Ill.Dec. 272, 275, 378 N.E.2d 1147, 1150 (1st Dist. 1978); *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982), and may be resolved by the court as a question of law.

■ Colonial contends that § 14.1 of the Administrator Agreement unambiguously

---

**6.** The three contracts establishing the parties' relationship provide variously that Pennsylvania or Illinois law governs their execution and interpretation. The applicable law for both jurisdictions is identical, so we need not determine which governs our analysis here. *International Adm'rs, Inc. v. Life Ins. Co.*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985).

establishes that the parties intended not to enter into a joint venture:

> [Hallmark's] relationship with [Colonial] shall be that of Independent contractor and nothing in this Agreement shall be construed as creating the relationship of employer and employee between [Colonial] and officers, employees, or agents of [Hallmark] or the relationship of a partnership or joint venture between the parties.

By itself, § 14.1 indicates unequivocally that the parties did not intend to establish a joint venture relationship and, more specifically, did not intend to assume any duties beyond those assumed under contract law. However, § 14.1 is not necessarily dispositive. A contract must be viewed as a whole, with all pertinent provisions contributing to a determination of the intent of the parties. *Shelton v. Andres*, 106 Ill.2d 153, 87 Ill.Dec. 954, 957, 478 N.E.2d 311, 314 (1985). Other provisions may make a seemingly unequivocal expression of intent ambiguous, creating a factual issue for the trier of fact to resolve on the basis of extrinsic evidence. *Lyons Savings and Loan Assoc. v. Geode Co.*, 641 F.Supp. 1313, 1322 (N.D.Ill.1986).[7] Plaintiffs contend that, notwithstanding the "boilerplate language"[8] of § 14.1, other contractual provisions demonstrate the parties intended to enter into a joint venture and that this apparent ambiguity should be decided by the trier of fact. We disagree.

The contracts did establish mutual control over the joint venture. Kubik was Hallmark's sole shareholder and managed the day-to-day affairs of the company. Colonial had and exercised its right to select a Hallmark director. Colonial also enjoyed rights to veto term employment contracts and stock sales and to establish claim adjustment and settlement standards.

That Colonial did not exercise control over Hallmark's day-to-day affairs does not diminish its degree of control over management structure and policy. *Ambuul*, 114 Ill.Dec. at 275, 516 N.E.2d at 430. However, the contracts did not contemplate the sharing of profits and losses. Colonial compensated Hallmark (and Kubik as sole shareholder) under the following scheme: $50 for each policy application that Hallmark processed; $3.50 per policy for each month the policy was in force; and 6% of collected policy premiums. This scheme established a commission arrangement, not a sharing of losses and profits. Hallmark would have received these regardless of its success or failure, and Colonial would have shared in Hallmark's losses only if Hallmark failed and defaulted on the Harris Bank loan or Colonial exercised its limited right to purchase the Hallmark stock.

In the absence of provisions evidencing a sharing of profits and losses, the unambiguous language of § 14.1 establishes as a matter of law that the parties intended not to enter into a joint venture. Accordingly, Colonial did not assume any fiduciary duties to the plaintiffs, and its motion for summary judgment as to Count II is granted.

## V.

### Available Forms of Relief

Plaintiffs seek various forms of relief including, *inter alia*, compensatory damages for lost profits and business opportunities, punitive damages and attorneys' fees. Colonial contends that on the undisputed facts plaintiffs are not entitled to lost profits (or, alternatively, profits that might have accrued after Colonial could have exercised its right to nonrenew the

7. As a district court in New York stated:
   If two parties draw a picture of an animal that has four legs and a tail, and the parties agree to label it "A Horse," it would be reasonable to conclude that the picture is in fact a drawing of a horse. If, however, the animal not only has four legs and a tail, but also has large floppy ears and a long trunk in place of a nose, then it would be unclear whether the parties actually intended to draw a horse or whether they meant to draw something else—

   i.e., an elephant. *In re PCH Associates*, 60 Bankr. 870, 874 (S.D.N.Y.), *aff'd*, 804 F.2d 193 (2d Cir.1986).

8. We are somewhat puzzled by plaintiffs' assertion that the parties included § 14.1 merely to satisfy unidentified insurance regulations, and it should accordingly be disregarded. To disregard the clause would be to render the regulations meaningless.

Administrator Agreement), punitive damages or attorneys' fees. We address each in turn.

### A. Lost Profits

██ Under Illinois and Pennsylvania law, a plaintiff may recover lost profits resulting from a breach of contract only if (1) the plaintiff can quantify the loss with a reasonable degree of certainty, (2) the profits were reasonably within the contemplation of the defendant at the time the parties entered into the contract, and (3) the plaintiff can establish that the defendant's breach caused the profits loss. *Klucznik v. Nikitopoulos*, 152 Ill.App.3d 323, 105 Ill.Dec. 141, 145, 503 N.E.2d 1147, 1151 (2d Dist.1987). The evidence must establish, with a fair degree of certainty, a basis for the assessment of damages. *Reeder v. Old Oak Town Center*, 124 Ill.App.3d 1045, 80 Ill.Dec. 322, 326, 465 N.E.2d 113, 117 (3d Dist.1984).

██ In situations in which the plaintiff has engaged in the business for only a short period of time, the plaintiff has an especially difficult burden in overcoming a presumption that lost profits are not ascertainable. The general rule under Illinois law is that the plaintiff's business must have been established prior to the interruption arising out of defendant's breach of duty so that lost profits are more than mere speculation. *Rhodes v. Sigler*, 44 Ill.App.3d 375, 2 Ill.Dec. 626, 630, 357 N.E.2d 846, 850 (3d Dist.1976). *See, e.g., Hill v. Brown*, 166 Ill.App.3d 867, 117 Ill.Dec. 687, 692, 520 N.E.2d 1038, 1043–44 (4th Dist. 1988) (denying lost profits for a business that had never produced the product at issue and plaintiff's evidence consisted only of predictions of future success); *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill.App.3d 168, 96 Ill.Dec. 633, 491 N.E.2d 912 (2d Dist.1986) (finding evidence of profits realized after defendant's

tortious interference ceased insufficient to establish lost profits for a new, untested business).

██ It is undisputed that the medical policy listed in Schedule A was a new product, that Colonial never underwrote and Hallmark never serviced any such policy, and that Hallmark never earned any profits since operations ceased when Colonial decided to nonrenew the Markman Contract. On these facts, Colonial contends that Hallmark was a new business without any profit-record, and plaintiffs cannot support their prayer for lost profits with anything more than speculative calculations and unsubstantiated predictions. Plaintiffs present evidence in the record that brings into dispute the material factual issue of whether Hallmark was a new business. In preparing to service the Markman medical policy, Hallmark set up operations not from scratch but by taking over certain operations of another insurance company, United Savings Life, with Colonial's blessing. We cannot conclude at this point that United Savings Life did not have a lengthy business history sufficiently similar to Hallmark's anticipated operations as to render its profit-record a probative measure of Hallmark's future profits. Further, evidence suggests that the Markman policy is not a new product but identical in all material respects to policies previously underwritten by Colonial which do have a substantial profit history. While we are somewhat skeptical that plaintiffs can on this limited evidence prove lost profits with the degree of certainty essential to recovery,[9] we cannot rule out the slim possibility that they have met their burden of proof, and it is for the trier of fact to make the final decision.[10]

### B. Punitive Damages

██ Under Illinois and Pennsylvania law, in the absence of a fiduciary duty

9. In *Drs. Sellke & Conlon*, the court indicated that past success in similar enterprises may not be sufficient to establish lost profits, for "conditions may vary with each endeavor." 96 Ill.Dec. at 638, 491 N.E.2d at 917.

10. We found as set forth earlier in this opinion that there are material factual disputes as to

whether the Administrator Agreement incorporated the nonrenewal provision of the Markman Contract. Accordingly, Colonial's alternative contention that plaintiffs may recover only lost profits prior to nonrenewal also provides no basis for summary judgment.

among the parties or the breach of an independent tort duty, a party to a contract cannot recover punitive damages for another party's willful or malicious breach of the contract. *Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 Ill.2d 87, 96 Ill.Dec. 939, 941, 492 N.E.2d 181, 183 (1986); *Batka v. Liberty Mutual Insurance Co.*, 486 F.Supp. 582, 583–84 (E.D.Pa.1980); *Daniel Adams Associates, Inc. v. Rimbach Publishing, Inc.*, 287 Pa.Super. 74, 429 A.2d 726, 728 (1981). We have found on the undisputed facts that Colonial assumed no fiduciary duties to Hallmark or Kubik. Accordingly, plaintiffs cannot recover punitive damages, and Colonial's motion for summary judgment on Count III is granted.

### C. Attorneys' Fees

■■■ A prevailing plaintiff may recover attorney's fees in a contract action if the contract expressly allows such recovery. *Waldinger Corp. v. Ashbrook–Simon–Hartley, Inc.*, 564 F.Supp. 970, 981 (C.D.Ill.1983), *aff'd in part*, 775 F.2d 781 (7th Cir.1985). The Administrator Agreement provides that

> [Colonial] agrees to indemnify, defend and hold [Hallmark] harmless from and against any and all losses, claims, demands, actions, suits, proceedings, liabilities, costs, damages, and expenses (including attorney's fees) which [Hallmark] may incur by reason of any error, omission, negligence or misconduct by [Colonial] or by reason of [Hallmark] strictly adhering to [Colonial's] written practices and procedures. Administrator Agreement, § 9.4.

The language "indemnify, defend and hold harmless" strongly suggests that this provision only applies in the event Hallmark is found liable to a third party as a result of Colonial's actions or inactions in the context of the contractual relationship. Plaintiffs contend that the provision does not expressly limit Colonial's liability to third-party actions. Even if we accept the position that the provision is ambiguous and must accordingly be submitted to the trier of fact, plaintiffs have failed to withstand summary judgment. The trier of fact resolves material ambiguities in a contract on the basis of other contractual provisions or extrinsic evidence. *Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d 1258, 1270 (7th Cir.1984); *Sherbrooke Homes, Ltd. v. Krawczyk*, 82 Ill.App.3d 990, 38 Ill.Dec. 391, 403 N.E.2d 622 (1st Dist.1980). Plaintiffs seek fees and therefore bear the burden of pointing to other contract language or presenting extrinsic evidence that supports their interpretation of the provision. They have failed to do so, and we accordingly grant Colonial's motion for summary judgment on the prayer for fees.

### VI.

### Sanctions [11]

■■■ The federal rules provide that the court may appropriately sanction an attorney or party that files a pleading or motion that is not "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Fed.R.Civ.P. 11. In determining whether an attorney was objectively reasonable in its propositions of law supporting a claim or position, we consider

> the amount of time the attorney had to prepare the document and research the relevant law; whether the document contained a plausible view of the law; the complexity of the legal questions involved; and whether the document was a good faith effort to extend or modify the law. *Brown v. Federation of State Medical Boards*, 830 F.2d 1429, 1435 (7th Cir.1987).

Colonial contends that plaintiffs were objectively unreasonable in maintaining that the contracts established a joint venture despite express language to the contrary. As we noted, § 14.1, while decisive, was

---

**11.** Colonial accompanied its motion to dismiss Counts II and III with a request for sanctions. Even though the motion to dismiss is moot, we consider here the request for sanctions since the parties' positions on summary judgment are identical to their positions in the context of dismissal.

not necessarily dispositive. The law supported plaintiffs' references to other provisions in the contract that may have created an ambiguity in the parties' intent for the trier of fact to resolve. Further, plaintiffs were not objectively unreasonable in relying on provisions establishing joint control and suggesting, in limited but nevertheless concrete situations, the sharing of losses to argue the parties intended to establish a joint venture. Accordingly, sanctions are not warranted.

### VII.

#### Conclusion

Colonial's motion for summary judgment on Count I as to its liability under the Stock Option Agreement and on Counts II and III is granted. Colonial's motion for summary judgment on Count I as to liability under the Administrator and Guaranty Agreements is denied. Colonial's motion for summary judgment on relief is granted as to attorneys' fees and denied as to lost profits. The motion to dismiss is denied as moot. It is so ordered.[12]

12. In light of the new posture of this case as the result of this opinion, it may be appropriate for the parties to seek to terminate this litigation by settlement. The attorneys should meet *before the next status hearing* and prepare to address this possibility.