HALLMARK INSURANCE ADMINIS-
TRATORS, INC., Plaintiff–Appel-
lee–Cross–Appellant,

v.

COLONIAL PENN LIFE INSURANCE
COMPANY, Defendant–Appellant–
Cross–Appellee.

Nos. 91–3694, 91–3762.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1992.

Decided April 12, 1993.

Rehearing Denied May 28, 1993.

Philip Fertik, Herbert Beigel (argued), Leigh R. Lasky, Beigel & Sandler, Chicago, IL, for plaintiff-appellee-cross-appellant.

David L. Doyle, Allan T. Slagel, Brian J. Williams (argued), Pope & John, Chicago, IL, for defendant-appellant-cross-appellee.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

CUDAHY, Circuit Judge.

Hallmark Insurance Administrators, Inc. (Hallmark) sued Colonial Penn Life Insurance Company (Colonial) for breach of contract. The contract arose from a series of business transactions between Hallmark, Colonial, Daniel J. Kubik, Hallmark's president and sole shareholder, and the Markman Group, Inc. (Markman). Kubik was an insurance consultant and, in 1986, proposed to Colonial that it issue and underwrite a new major medical insurance policy.[1] The proposal called for Markman to sell the new policy, utilizing its existing network of independent sales agents, and for a third party administrator to service claims made on the policies. Kubik formed Hallmark, with Colonial's financial support, to administer the proposed policy.

Despite Colonial's initial rejection of Kubik's proposal, the parties continued to negotiate and ultimately agreed to a group of four interrelated contracts, two of which are relevant to these appeals.[2] On September 24, 1986, Colonial and Markman executed a contract denominated the "Marketing Management Agreement" (Marketing Agreement) which authorized Markman to sell the new major medical policy. Under a provision of the Marketing Agreement, either party could cancel the agreement by giving appropriate notice.

On that same date, Colonial and Hallmark entered into a contract, entitled "Ad-

---

1. The insurance industry frequently refers to types of insurance policies as "products," a term we may occasionally use.

2. The other two agreements pertain to Colonial's financial support of Hallmark. In one, the subject of separate litigation, Colonial guaranteed payment of a $1.5 million loan to Hallmark. The other gave Colonial an option to purchase Hallmark's stock from Kubik after five years.

ministrator Agreement," providing, *inter alia*, that Hallmark would process applications for, and administer claims on, the new medical insurance product. Several provisions of the Administrator Agreement are pertinent to these appeals. First, the Administrator Agreement provided that it "shall continue in full force and effect through December 31, 1991 ... [and] shall subsequently renew for successive one-year periods unless one of the parties gives notice of non-renewal six months prior to December 31, 1991 or any subsequent anniversary date." Defendant's Exh. 3 § 12.1 (hereinafter DX 3). Second, it stated that Hallmark's "duties and obligations shall extend to those insurance certificates and policies set out in Schedule A...." DX 3 § 1.1. Only the proposed major medical policy to be sold by Markman pursuant to the Marketing Agreement was listed on Schedule A. DX 3 Sch. A. Finally, the Administrator Agreement provided that the parties "shall mutually explore opportunities to increase [its] scope...." DX 3 § 1.1.

On January 22, 1987, Colonial, acting upon instructions from its parent company, informed Hallmark and Markman of its decision not to offer the proposed medical insurance, and, on February 12, formally gave notice to Markman that it would not renew the Marketing Agreement. Allan Keysor, a representative of Colonial, met with Kubik in early February 1987 to discuss various options, including the possibility that Colonial would permit Hallmark to administer certain of its other policies. During these negotiations, Hallmark, through its attorney, informed Keysor that it believed Colonial had "unilaterally breached its contracts." Plaintiff's Exh. 195. The next time Keysor and Kubik spoke, Kubik stated that he did not wish to discuss alternative arrangements further and that Hallmark had filed suit against Colonial.

Hallmark brought suit in the United States District Court for the Northern District of Illinois alleging breaches of several contracts and of fiduciary duties arising out of a joint venture. Jurisdiction was properly predicated upon the diversity of citizenship between the parties. The district court's grants of summary judgment in favor of Colonial disposed of most of Hallmark's allegations. *See Hallmark Ins. Adm'rs, Inc. v. Colonial Penn Life Ins. Co.*, 697 F.Supp. 319 (N.D.Ill.1988); Mem. Op. & Ord. (June 20, 1989). But Hallmark's claim that Colonial breached the Administrator Agreement proceeded to trial. The jury returned a verdict in favor of Hallmark and set damages at $2.5 million. The district court denied Colonial's motion for judgment notwithstanding the verdict and entered final judgment. Colonial appeals. Hallmark cross-appeals on the ground that the district court improperly instructed the jury regarding the calculation of damages.

## I. Colonial's Liability Under the Administrator Agreement

■ Colonial argues that the district court erred by failing to hold, as a matter of law, that Colonial did not breach the Administrator Agreement. The crux of this argument is that the Administrator Agreement is, when read together with the Marketing Agreement, unambiguous and that the district court improperly allowed the case to go to the jury. We disagree. There is, as the district court found, a conflict between the explicit five-year term stated in the Administrator Agreement and the provision providing that Hallmark's duties and obligations extend only to those policies specified in Schedule A. The former implies a five-year contract of fixed duration, while the latter suggests that Hallmark's rights under the Administrator Agreement were connected to the Marketing Agreement, a contract which either Markman or Colonial could terminate by giving six-months notice. This ambiguity could only be resolved by the finder of fact. The district court thus did not err by submitting this issue to the jury and instructing it that:

Hallmark contends that the parties intended that the non-renewal and termination provisions of the administrator agreement exclusively govern the par-

ties' rights to terminate or non-renew the administrator agreement.

If you find that the parties intended the above non-renewal and termination provisions of the administrator agreement to exclusively govern the parties' rights to terminate or non-renew the administrator agreement, then you are to consider only those provisions in determining Hallmark's claim that Colonial Penn terminated the administrator agreement prior to its stated termination date and terminated the administrator agreement for reasons not permitted under the administrator agreement.

Tr. at 560–61. The jury apparently credited Hallmark's characterization of the facts. Although reasonable people might reach a different conclusion, we do not believe that the evidence supporting Colonial's position was so overwhelming that the jury's verdict in favor of Hallmark cannot stand, and accordingly we will not disturb the district court's denial of Colonial's motion for judgment notwithstanding the verdict. *Commercial Credit Equip. Corp. v. Stamps*, 920 F.2d 1361, 1365 (7th Cir.1990).

Colonial also relies heavily on language in the Administrator Agreement and on Hallmark's "admission," through Kubik, that tend to show that Colonial retained the unrestricted right to make all underwriting decisions pertaining to the new policy, including the ultimate decision whether to offer the policy at all. But again, where Colonial sees unarguable clarity, we find an ambiguity which the jury resolved in favor of Hallmark. We note initially that the provision in the Administrator Agreement to which Colonial refers does not explicitly address Colonial's obligation to offer the proposed policy in the first instance. Instead, this provision merely provides that Colonial "retains sole authority to establish underwriting rules for approval of applicants for Policies." DX 3 § 5.2. On its face, this provision establishes only that, *once (or if) the new policy is issued*, all underwriting rules are within Colonial's unfettered discretion. We thus reject, as

did the district court, Colonial's argument that this language of the Administrator Agreement is unambiguous as a matter of law. *Walton v. Philadelphia Nat'l Bank*, 376 Pa.Super. 329, 545 A.2d 1383, 1389 (1988) (contract ambiguity is a question of law reviewed de novo on appeal).[3]

Colonial's real argument seems to be that the language in question is insurance industry boilerplate, which all parties to the transaction, including Kubik, understood as granting Colonial the absolute right to decide when, if ever, to offer the new major medical policy. As evidence of this, Colonial points to Kubik's testimony that, as a general matter, an insurer, such as Colonial, has the right to decide whether to offer a particular product at all. Tr. at 244, 248, 256–57, 264. Colonial construes this as an "admission" by Kubik that Colonial could decide, without breaching the Administrator Agreement, not to offer the proposed policy. But Colonial fails to point out that Kubik went on to state that this default rule did not operate in "cases where there are other conditions." *E.g.*, Tr. at 256. *See also* Tr. at 244 ("Q: [I]sn't it true ... that ... you have never been involved with a company who wrote a product and did not retain the right to withdraw it from the market? A: In the absence of *external conditions* that's correct.") (emphasis supplied); Tr. at 248 (Kubik testified, "In the absence of *other conditions* the insurance company has the right to offer a product or not.") (emphasis supplied). Specifically, he referred to the Administrator Agreement, and, presumably, its fixed, five-year term, as such a condition. Tr. at 257 ("Q: And as we talked about this morning, [Colonial] had the underwriting ... capability to stop offering [the policy] at any time ...? A: I didn't agree with that; I said subject to other conditions *like my contract.*") (emphasis supplied); Tr. at 264 ("Q: [Colonial] can agree not to accept any more applications for policies? A: Subject to my contract.").

---

**3.** We apply Pennsylvania law in accordance with the Administrator Agreement's choice of law provision. DX 3 § 14.4.

Considered in its entirety, Kubik's testimony supports Hallmark's position that Colonial breached the Administrator Agreement when it decided not to offer the contemplated medical insurance product. Kubik acknowledged that insurers typically retained the authority to decide whether or not to offer a particular policy for sale. But he went on to state that the agreement between Hallmark and Colonial was to the contrary. Kubik never questioned Colonial's power to refuse to offer the product,[4] but merely assailed its right to do so under the Administrator Agreement. In denying Colonial's motion for summary judgment on this point, the district court noted:

> Kubik's admission that an underwriter customarily reserves the right to cease issuing a policy does not prove conclusively that Colonial expressly reserved that right in the context of this case. With Kubik's testimony, it remains disputed whether Colonial promised Hallmark that the policy would be available at least until 1991.

*Hallmark Ins. Adm'rs*, 697 F.Supp. at 324 n. 4. The jury again resolved this factual dispute in favor of Hallmark. The record evidence adequately supports this verdict, which the district court properly allowed to stand.

## II. Damages for Breach of the Administrator Agreement

The parties agree that the proper measure of damages in this case is the profits Hallmark lost as a result of Colonial's decision not to offer the proposed policy. They disagree, however, as to how such profits should be calculated and for what period such recovery should be allowed.

Colonial argues that even if "nonrenewal of the [Marketing Agreement] did not immediately terminate or nonrenew Hallmark's rights under the Administrator Agreement, the trial court erred when it failed to limit Hallmark's recoverable damages ... to ... those profits, if any, Hallmark would have earned in the first year...." Appellant's Br. at 40. This is merely a restatement of its argument that Hallmark's rights under the Administrator Agreement were connected to Markman's rights under the Marketing Agreement. We reject this contention largely for the reasons we have already discussed in connection with the jury verdict on liability.

Colonial again points to an "admission" in Kubik's testimony. This time, Colonial maintains that Kubik conceded that "Hallmark had a right to administer the product only for as long as [the Marketing Agreement] remained in effect." Appellant's Br. at 46. But we observe that Colonial has again materially mischaracterized the record by failing to place certain snippets of Kubik's testimony in context. Kubik merely acknowledged that "as of the date of the [Administrator] agreement" Hallmark would only be permitted to administer those policies sold pursuant to the Marketing Agreement. Tr. at 263. In contrast, Kubik had previously denied that the two agreements were inextricably linked: "Q: You [Kubik] understood that under the administrator agreement that the only right you had to administer a product was a right to administer something under the marketing agreement. A: No, that's not correct." Tr. at 260. Kubik did not admit that Hallmark's rights were coterminous with Markman's rights under the Marketing Agreement. His testimony is consistent with the view that Hallmark was entitled to administer the proposed product for the entire five-year duration of the Administrator Agreement, and that at the time the Administrator Agreement was executed, the new product was to be sold by Markman. In other words, Schedule A, the provision connecting the two agreements, merely described with specificity the medical policy that was the subject of the parties' agreement. Colonial's obligation to offer the product, and Hallmark's corresponding right to administer claims made against it, existed independently, irrespective of who sold the product. *See Hall-*

---

**4.** We note in passing that Colonial's promise to offer the proposed policy for sale may not be specifically enforceable. But this is a suit for damages not governed by the equitable considerations counseling against specific performance of certain obligations.

*mark Ins. Adm'rs,* 697 F.Supp. at 324 ("[A] trier of fact could reasonably conclude that the parties referenced the [Marketing Agreement] in Schedule A not to supplement the parties' rights and duties but merely to identify with specificity the medical policy listed.").

The jury, of course, did not have to credit this version of the parties' contractual intent. It is, however, a view adequately supported by the evidence in the record, and it was thus not error for the district court to instruct the jury:

> If you find that the parties intended the nonrenewal and termination provision in the administrator agreement [to] govern Colonial Penn's right to renew or terminate the administrator agreement, then Hallmark's damages for lost profits are for the period of September 24, 1986, through December 31, 1991.

Tr. at 1035.[5]

Were it not for Hallmark's cross-appeal, we could simply affirm the jury's award of damages since it finds support even in Colonial's depiction of the relevant facts.[6] Hallmark has argued, however, that the district court improperly instructed the jury that, in determining Hallmark's damages, it should deduct from revenue lost as a result of Colonial's breach both fixed and variable costs. By challenging this instruction, Hallmark calls into question the propriety of the entire damage award. Tr. at 1034.

■ The law in Pennsylvania, as elsewhere, is that lost profit damages are calculated by subtracting from revenue lost as a result of the breach those costs avoided as a result of the same breach. *Kutner Buick, Inc. v. American Motors Corp.,* 868 F.2d 614, 618 (3d Cir.1989). This rule is based on the notion that a party harmed by another's breach of contract is entitled to collect those lost net revenues that would have helped defray fixed costs and contributed to profit.[7] A central element in making this calculation, therefore, is the ascertainment of which costs vary with output and which do not (i.e., are truly fixed). Certain rules of thumb have been developed to simplify this determination. For example, if a business entity operates only a single enterprise, i.e., a single revenue producing activity, all costs are presumed to be variable (i.e., vary fully with output) and are deducted from gross revenue in determining a plaintiff's recovery.[8] *Kutner Buick,* 868 F.2d at 818. If a business operates more than one activity, however, fixed costs are not usually deducted from gross revenues since the business would be expected to continue operating and "fixed" costs would continue to be incurred. The owner would be entitled, in this situation, to collect the contribution toward fixed ex-

---

5. The district court also gave an instruction consistent with Colonial's theory:
 > If you find that the parties intended the nonrenewal and the termination provision of the [Marketing Agreement] to be part of the administrator agreement, and further find that the parties intended that the nonrenewal provision of the [Marketing Agreement] govern Colonial Penn's right to nonrenew or terminate the administrator agreement and not the nonrenewal and termination provisions of the administrator agreement, then Hallmark's damages for lost profits are for the term of September 24, 1986, through September 24, 1987.

 Tr. at 1035.

6. Colonial stated, "At most, Hallmark's lost profits for one year would have been $524,288." Appellant's Br. at 47. We have concluded, however, that the jury was entitled to award Hallmark lost profits for five years. According to Colonial's own figures, therefore, a jury award

of up to $2,621,440 (5 times $524,288) was reasonable. Moreover, the record evidence tends to show that Hallmark's profit in years two through five would have been greater than that in the first year. *See, e.g.,* Plaintiff's Exh. 170. The actual award of $2.5 million thus suggests a discount in Colonial's favor.

7. The amount by which revenue net of variable costs exceeds fixed costs is "profit" in the sense that term is commonly understood.

8. If a business has only one source of revenue, any breach would effectively terminate all business activity. The law assumes that all costs cease as well. This is only a rough approximation of reality, however, since some costs, such as payments on a long-term lease, are less easily terminable than others and the injured party might continue to be responsible for them notwithstanding a total cessation of business activity.

penses that it would have received but for the breach.

█ Hallmark appears to be a multiple activity business. In addition to the revenue Hallmark would have received pursuant to the Administrator Agreement, Hallmark received in excess of $6 million over a three-year period from an agreement with another insurer.[9] Under *Kutner Buick*, Hallmark is, therefore, a multiple activity business, and, presumably, its "fixed" costs would in considerable part continue even if its revenue from Colonial ceased. Some or all of those "fixed" costs would not be deductible from lost revenues. Therefore, it was incorrect to instruct the jury to subtract Hallmark's fixed costs from the revenue Hallmark would have received pursuant to the Administrator Agreement.

We are left then with the question of remedy. The usually appropriate remedy for an erroneous jury instruction is a new trial. *Heller Inter. Corp. v. Sharp*, 974 F.2d 850, 860 (7th Cir.1992) (proper remedy for an erroneous jury instruction is a new trial, not a judgment n.o.v.). Because the present record is incomplete, i.e., it does not adequately differentiate those costs which vary with output from those which are truly fixed, we cannot simply add fixed costs to the present verdict as Hallmark suggests. A new trial is thus the only available remedy. But Hallmark has explicitly disclaimed any interest in a new trial, Appellee's Reply Br. at 6, and Colonial, on this point, would presumably prefer to retain the verdict as well. Accordingly, we will respect the parties' wishes and simply affirm the district court's award of damages.

For the foregoing reasons the judgment of the district court is, in all respects, AFFIRMED.

---

**9.** The record discloses that one-third of the revenue generated by this second agreement was to be diverted to another of Kubik's companies. But this leaves two-thirds available to defray Hallmark's fixed costs.